UNITED STATES of America,

v.

Ella SHIPP, a/k/a "Ella Stitman," McAvoy Joseph Shipp, a/k/a "Mac," Marty Frierson, Vivian Elaine Rodriguez, a/k/a "Elaine," Wilfred C. Burch, Sr., a/k/a "Billy," Jane Doe, a/k/a "Tippy," Charles E. Byers, a/k/a "Chuckie," Walter Lee Hill, Leola Moreland, Fred Stitman, Viola Reid, a/k/a "Vida Johnson," Gloria Cannon and Paul Beranbaum, Defendants.

No. 83 Crim. 0574.

United States District Court, S.D. New York.

Jan. 4, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for United States of America; Edward J.M. Little, Asst. U.S. Atty., New York City, of counsel.

John Byrnes, New York City, for defendant Ella Shipp.

Audrey Strauss, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for defendant McAvoy Joseph Shipp.

Irving Anolik, New York City, for defendant Vivian Rodriguez.

Frank Handelman, New York City, for defendant Wilfred Burch.

Henry Putzel, III, New York City, for defendant Jane Doe.

David Seth Michaels, New York City, for defendant Charles Byers.

Ralph Sperli, Cleveland, Ohio, for defendant Leola Moreland.

Lawrence Stern, New York City, for defendant Fred Stitmon.

James Moriarty, New York City, for defendant Viola Reed.

Stephen Goldenberg, New York City, for defendant Paul Beranbaum.

## OPINION

EDWARD WEINFELD, District Judge.

These are a series of motions by various defendants named in a single count indictment filed September 15, 1983, charging them and others with conspiracy to distribute and to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. § 846 (1982). The charge centers principally about the defendant Ella Shipp and her alleged large scale illegal drug distribution activities in Cleveland, Ohio and New York City, in concert with other defendants during the period from on or about January 1982 through mid-September 1983.

On September 7, 1983, shortly before the return of the indictment, a complaint was filed accompanied by an extensive affidavit of Special Agent Michael E. Mott of the New York FBI office submitted for the limited purpose of establishing probable cause for the issuance of warrants to search described premises and warrants to arrest named defendants. The affidavit recites details of the activities of named defendants based in part upon information derived from previously authorized wiretap orders. The affidavit is virtually a bill of particulars of each defendant's purported conduct during the course of the alleged conspiracy. In substance, it charges that in New York City Ella Shipp was assisted by her husband, defendant McAvoy Joseph Shipp ("Mac Shipp"), who introduced her to a heroin source in September, 1981, and thereafter distributed narcotics, by her son, defendant Marty Frierson ("Frierson"), who distributed and stored narcotics and collected the proceeds from drug sales, by defendants Wilfred C. Burch, Sr. ("Burch"), Viola Reid ("Reid"), Gloria Cannon ("Cannon"), and Paul Beranbaum ("Beranbaum"), who distributed narcotics obtained in New York, and by defendant Vivian Elaine Rodriguez ("Rodriguez"), who was one of Ella Shipp's principal suppliers of cocaine.

The complaint further alleges that, in Cleveland, Ella Shipp's chief aide was one "Tippy," now known to be Ella Shipp's sister, defendant Margaret Wilkinson ("Wilkinson"), and that defendants Charles Byers ("Byers"), Walter Lee Hill ("Hill"), Fred Stitmon ("Stitmon"), and Leola Moreland ("Moreland") assisted in transporting drugs from New York to Cleveland and in their later distribution.

Defendants Mac Shipp, Ella Shipp, Stitmon, Burch and Moreland move to suppress items of evidence obtained as a result of the telephone surveillance orders, and search and arrest warrants allegedly issued in violation of the United States Constitution and federal statutes. A number of defendants also move to dismiss the indictment and for severance on grounds of misjoinder and prejudicial spillover; also they seek extensive pretrial discovery of materi-

al claimed to be necessary to defend against the charge.[1]

I

## MOTIONS TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO COURT-ORDERED WIRETAPS

On October 20, 1982, Judge David N. Edelstein of this Court authorized the wiretap of Ella Shipp's telephone at her New York City apartment. Pursuant to this order, which was based upon detailed information sworn to by FBI Agent Mott, the government recorded various telephone conversations which it contends indicate ongoing conspiratorial conduct in the distribution of narcotics in the New York and Cleveland areas. The wiretap was terminated on November 19, 1982. On December 6, 1982, Judge Robert L. Carter granted an extension of the prior wiretap order and subsequent monitoring yielded alleged additional incriminating conversations involving Shipp or one or more of the other defendants.

### A. PROBABLE CAUSE

Defendant Moreland, joined by other defendants, seeks to suppress all conversations that were intercepted and any evidence derived therefrom upon the ground that there was no probable cause for the issuance of either wiretap order as re-

quired by 18 U.S.C. § 2518(3).[2] It is urged that the information relied upon to establish probable cause was stale, that Ella Shipp's use of the telephone to make drug sales was not sufficiently described to justify a belief that information concerning the specified offenses would be obtained by a wiretap, and that pen registers[3] showing links between the Shipp telephone and those of individuals associated with large scale narcotics operations were inconclusive. Defendant Stitmon challenges the probable cause finding on the basis that there was no probable cause to believe that he was involved with Ella Shipp's organization; Stitmon also asserts that the affidavit supporting the application for a wiretap order contained material, false information, and that, if the order is not invalid outright, he is at least entitled to an evidentiary hearing. Moreland also attacks the probable cause findings underpinning the order extending the wiretap.

Under the federal wiretap statute, the provisions of which are contained in Title III of the Omnibus Crime Control and Safe Streets Acts of 1968, as amended,[4] before a wiretap order may issue, a judicial officer of competent jurisdiction must find, on the basis of the application, that:

> ... there is probable cause for belief that an individual is committing, has committed, or is about to commit a par-

1. In their papers defendants Burch and Ella Shipp make specific motions and join in all applicable motions of codefendants. Upon the argument, defendants Rodriguez, Barenbaum, Wilkinson, Byers, Reed, and Mac Shipp applied for, and were granted, permission to join the applicable motions of codefendants.

 In instances in which a defendant moved for relief by joining the motion of a codefendant the motion of the joining defendant is disposed of in the same manner as those briefed and argued by counsel and in accordance with reasons substantially identical to those discussed *infra.*

 At the oral argument of the motions, the Court made oral dispositions of a number of the motions for discovery and for extensions of time to examine the transcripts of intercepted conversations for the purposes of challenging the government's compliance with the "minimization" requirements of the wiretap statute, 18 U.S.C. § 2518(5) (1982).

2. This provision conforms to the Fourth Amendment's requirement of probable cause and has survived numerous constitutional challenges. *See, e.g., United States v. Southard,* 700 F.2d 1, 27 & n. 35 (1st Cir.1983); *United States v. Kail,* 612 F.2d 443, 446 (9th Cir.1979), *cert. denied,* 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 810 (1980); *United States v. Tortorello,* 480 F.2d 764, 775 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

3. A pen register is a device that records the telephone numbers dialed from a particular telephone. However, it does not overhear the communication and does not indicate whether calls are actually completed. *See United States v. New York Tel. Co.,* 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 366 n. 1, 54 L.Ed.2d 376 (1977).

4. Pub.L. No. 90–351, 82 Stat. 212 (codified as amended at 18 U.S.C. §§ 2510–20 (1982)).

ticular offense enumerated in [18 U.S.C. § 2516 (1982)];

... there is probable cause for belief that particular communications concerning that offense will be obtained through such interception [sought in the application];

. . . . .

[and] there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.[5]

In determining probable cause under this statute the same standard is applied as in determining whether probable cause exists to issue search or arrest warrants.[6] The standard in reviewing a previous determination of probable cause for the issuance of a warrant by a judicial officer is "only a probability, and not a prima facie showing of criminal activity."[7]

■■■ Moreland's first argument, that the information relied upon was stale, is refuted by the facts and numerous decisions addressing similar arguments in situations involving ongoing criminal activity. Specifically, Moreland asserts that between September 20, 1982 and the issuance of the wiretap order on October 20, 1982, the information submitted to Judge Edelstein "failed to provide a factual predicate" for a finding of probable cause. Entirely apart from the fact that Judge Edelstein's finding is entitled to substantial deference,[8] the contention is without substance; it disre-

gards the factual allegations of Agent Mott's affidavit. Most pointedly, the affidavit attests that on October 11, 1982, nine days before issuance of the wiretap order, Ella Shipp told "Source A" that defendant Byers would be handling heroin distribution in Cleveland for her organization. At this time Ella Shipp also offered .to sell Source A "a couple of kilos" of cocaine. Moreover, even assuming, contrary to the affirmations of Agent Mott, that nothing indicating probable cause occurred in the month prior to the wiretap order, our Court of Appeals has held that "[w]here the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant.".[9] Contained in the twenty-four pages of Agent Mott's allegations supporting probable cause are numerous facts from which a conclusion of ongoing criminal activity, emanating from the Shipp apartment in New York, could readily be drawn. As early as June 15, 1982, Ella Shipp had told undercover agents of her $2000 per month rental apartment in New York, her distribution of heroin purchased in New York, and her $2000 per month phone bills arising from her drug business. On July 1, 1982, Shipp provided FBI Agent Theodore J. Domine, Jr. ("Domine"), who in an undercover capacity had purchased heroin from Ella Shipp in Cleveland, with the telephone number at her New York apartment. The clear intent and purpose was to discuss and negotiate illicit drug transactions. During July, August, and September, Agent Do-

---

5. 18 U.S.C. § 2518(3) (1982).

6. See, e.g., United States v. Fury, 554 F.2d 522, 530 (2d Cir.), cert. denied, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); United States v. Londono, 553 F.2d 805, 810 (2d Cir.1977).

7. United States v. Travisano, 724 F.2d 341 at 345–46 (2d Cir.1983).

8. See United States v. Martino, 664 F.2d 860, 867 (2d Cir.1981), cert. denied, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982); United States v. Perry, 643 F.2d 38, 50 (2d Cir.1981); United

States v. Jackstadt, 617 F.2d 12, 13 (2d Cir.), cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).

9. United States v. Martino, 664 F.2d 860, 867 (2d Cir.1981), cert. denied, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982); see United States v. Webster, 639 F.2d 174, 178 (4th Cir.1981), modified on other grounds, 669 F.2d 185 (4th Cir.), cert. denied, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); United States v. Hyde, 574 F.2d 856, 864–65 (5th Cir.1978).

mine had no fewer than nine drug-related conversations with Ella Shipp involving the telephone in her New York apartment.[10] Agent Domine and Agent John E. Bell, Jr., had personally visited the Shipp apartment on July 21, 1982, and while there were told by Mac Shipp that "his cocaine supplier would soon be there." On this occasion Ella Shipp told the agents that she sold her heroin for $250,000 a kilogram and made $50,000 on each sale.[11] In the light of these allegations it borders on the absurd to contend that the information relied upon by Judge Edelstein was stale. Rather, they support the charge of extensive, ongoing criminal activity. These same allegations repel Moreland's second argument that there was an absence of probable cause to believe that Ella Shipp dealt in narcotics over her New York telephone.

■ ■Moreland's third argument, that the pen registers linking the Shipp telephone to those of known narcotics organizations provides no basis for inferring probable cause, since there was no evidence that those calls were related to drug transactions, is superficial and unrealistic. It is recognized that the "use of pen registers, which do not identify the participants to a telephone conversation, ... would be unlikely to uncover [one's] partners in crime." [12] However, a steady flow of communications between the tapped wire and others may serve as a link in the chain of evidence to support the charge of ongoing criminal activity.[13] And

even if the pen register connections between the Shipp telephone and known narcotics dealers were "merely conclusory[,] ... [n]onetheless ... there was specific informant information bolstered by independent investigations of law enforcement personnel," [14] including the nine drug-related conversations over the Shipp telephone, that give powerful support to Judge Edelstein's finding of probable cause. Agent Mott's detailed and informative affidavit could hardly be described as "a stringing together of what appear to be vague and unsupported rumors, suspicions, and bare conclusions of others." [15] Agents Mott, Domine, and Bell are fulltime law enforcement officers and their observations "are plainly a reliable basis for a warrant applied for by one of their number...." [16]

■ Stitmon's claim that there was no basis for believing evidence of his involvement in the Shipp organization would be uncovered by a wiretap is without substance. The argument misstates the requirements of probable cause. "Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." [17] There is no requirement that prob-

---

10. Affidavit of Michael F. Mott in Support of Application Authorizing the Interception of Wire Communications [hereinafter Mott Aff. No. 1] at ¶¶ 18, 19, 22–26, 28(a), 28(c) (conversations of July 13 and 21, 1982; August 11, 25, and 31, 1982; September 1 and 20, 1982). Agent Mott related four other conversations between Domine and Ella Shipp that were not specified as occurring over particular telephone lines. See Mott Aff. No. 1 at ¶¶ 14, 16, 19(g), 27 (conversations of June 11 and 19, 1982; July 21, 1982; and September 2, 1982).

11. Mott Aff. No. 1 at ¶ 19(f).

12. United States v. Martino, 664 F.2d 860, 868 (2d Cir.1981), cert. denied, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982).

13. See, e.g., United States v. Tehfe, 722 F.2d 1114 at 1119 (3rd Cir.1983) (finding that pen registers may in conjunction with other evidence give rise to an inference of "an extensive criminal enterprise that relied on the telephone").

14. United States v. Hillard, 701 F.2d 1052, 1063 (2d Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983).

15. In Re Grand Jury Proceedings, 716 F.2d 493, 502 (8th Cir.1983) (invalidating search warrant under standards prescribed by Gates).

16. United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965).

17. Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967).

able cause be established with respect to every defendant ultimately indicted.[18]

Stitmon also claims that the affidavit supporting the wiretap application contained material, false statements and that he is at least entitled to a hearing under *Franks v. Delaware*.[19] He argues that at most the tapes reveal he was offered drugs by Ella Shipp; this, Stitmon claims, implies that the informant—Source A—falsely told Agent Domine that in January, 1982, Stitmon was involved in heroin trafficking with Ella Shipp; he claims, further, that this allegation, included in the Mott affidavit, was material to granting the wiretap order.

Under *Franks*, a hearing to contest an affidavit supporting a wiretap order is necessary only "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause."[20]

■ Stitmon has not made the required showing. First, Stitmon's claim that the tapes show no "involvement" with the Shipp organization is not borne out by the record.[21] Second, even if the tapes were construed to indicate a lack of involvement, as Stitmon suggests, there is no necessary factual misstatement. Simply because Stitmon made no incriminating comments in conversations with Ella Shipp in early November, 1982, is hardly substantial evidence that he was not a member of her organization in January, 1982. An act innocent on its face may nevertheless be in furtherance of a conspiracy, in which event it is an overt act that is an element of the crime of conspiracy.[22] Third, even if the January statement were false, Stitmon presents no specific evidence that the affiant agent knew it was false or recklessly disregarded information indicating its falsity. Finally, Stitmon's culpability was not necessary to a finding of probable cause. As Agent Mott's recitation of Agent Domine's conversations and transactions with Ella Shipp indicate, there was overwhelming evidence independent of the informant's statement about Stitmon to support the wiretap order.[23]

■ Moreland's further claim that the wiretap extension was granted without probable cause is also without merit. Although the wiretap statute requires that each extension must be supported by inde-

---

**18.** *See United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Stitmon's challenge on this ground is not specific, but he vaguely alludes to the requirement that conversations intercepted pursuant to a wiretap order must be specified with particularity. However, as the Supreme Court ruled in *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977):

> The Fourth Amendment requires specification of "the place to be searched, and the persons or things to be seized." In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized.

*Id.* at 427 n. 15, 97 S.Ct. at 667–68 n. 15; *see United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir.1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); *United States v. Tortorello*, 480 F.2d 764, 780 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). In this case the requirements of the Fourth Amendment were met by limiting the wiretap order to conversations over Ella Shipp's New York telephone line involving the offenses enumerated in Agent Mott's affidavit. *See* Mott Aff. No. 1 at ¶ 2.

**19.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**20.** *Id.* at 155–56, 98 S.Ct. at 2676 (1978).

**21.** *See infra* note 43.

**22.** *See, e.g., Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957); *United States v. Slocum*, 695 F.2d 650, 654 (2d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983).

**23.** *Cf. United States v. Davis*, 714 F.2d 896, 898 (9th Cir.1983) (affiant's false statement of personal knowledge of facts contained in affidavit); *United States v. Southard*, 700 F.2d 1, 8 (1st Cir.1983) (allegation of false statement based on inconsistency of information contained on tapes of intercepted conversations with allegations in affidavit rejected without full evidentiary hearing); *United States v. Vasquez*, 605 F.2d 1269, 1282 (2d Cir.) (omitted facts held not material), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979).

pendent findings of probable cause,[24] there is no requirement, as Moreland suggests, that the fruits of the initial wiretap must be the sole basis for findings of probable cause required by the extension provisions. Indeed, if anything, the conversations intercepted pursuant to the first wiretap order confirm the existence of an ongoing criminal enterprise operating from Shipp's New York apartment and elsewhere. Agent Mott's affidavit in support of the extension lists twenty-seven conversations recorded under the first wiretap order. These conversations almost uniformly refer to business deals concerning an unnamed "product." Large amounts of money are discussed, and, as Agent Mott explained, code phrases used in the drug trade were frequently employed. Reliance on such expert interpretation is not improper in issuing a warrant.[25] No legitimate claim can be made that probable cause no longer existed when Judge Carter issued the extension order.

## B. FINDINGS WITH RESPECT TO "NORMAL INVESTIGATIVE PROCEDURES"

■ The defendants next challenge the issuance of the wiretap orders on the ground that normal investigative procedures had not been exhausted as required by 18 U.S.C. §§ 2518(1)(c) and (3)(c).[26] They reject out of hand as "boiler plate" the detailed explanation FBI Agent Mott submitted in support of the order that the usual techniques of surveillance, telephone toll records, pen registers, informants, or search warrants were unsuccessful, or

were unlikely to succeed if tried, or were too dangerous to undertake. Mott, in a twenty-nine page affidavit, cited details of investigative activities, including instances of surveillance that were fruitless and asserted that there was no reason to expect a different result if such activities were to be continued. On twelve separate occasions FBI agents surveilled Ella Shipp, the main target of the investigation, when it was likely she would be meeting her suppliers, but these efforts were of no avail since the surveilling agents were unable to identify the persons she met. It was pointed out that, even had the agents been able to identify a particular person she met, the purpose of the meeting would not be established without evidence available through a prior tapped conversation. The fact that Ella Shipp regularly called or received telephone calls in New York City did not without more establish who were the sources of her supply or who were her customers or which calls were of an innocent nature.

Mott further indicated that, although extensive undercover investigation had already been conducted, there was no realistic prospect of infiltration of the criminal enterprise beyond the level of Ella Shipp and that the enterprise's secretive nature, which insulated the acts of the criminal associates from the scrutiny of outsiders, foreclosed obtaining sufficient evidence solely derived from undercover agents' activities—in fact, that despite his efforts the undercover agent was unable to determine Ella Shipp's sources of supply. Moreover, the affidavit represents that reliance upon

---

**24.** 18 U.S.C. § 2518(5) (1982).

**25.** *Cf. United States v. Martino*, 664 F.2d 860, 864 n. 3 (2d Cir.1981) (use of experts in drug trade as trial witnesses), *cert. denied*, 456 U.S. 929, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982).

**26.** These provisions state, in relevant part:
Each application for an order authorizing or approving the interception of a wire or oral communication ... shall include

 . . . . .

... a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to

be too dangerous [, 18 U.S.C. § 2518(1)(c) (1982);]
Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire or oral communications ... if the judge determines on the basis of the facts submitted by the applicant that—

 . . . . .

... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[, 18 *U.S.C.* § 2518(3)(c) (1982).]

the undercover agent posed unacceptable risks to his life and safety. Ella Shipp made statements to the undercover agent and another agent that they would be killed if anything went wrong on a proposed deal—that her people in New York City would cut their heads off. On another occasion she told Source A that her people were connected to organized crime and would kill anyone who "screws her over."

Mott further stated in his affidavit submitted to the Court that an application for a search warrant at that stage of the investigation was premature since the information indicated that Shipp customarily obtained drugs from her suppliers only on an order previously placed by a customer; that it was not known where she hid the heroin pending delivery; and that the investigative methods employed up until the time of the wiretap application did not by themselves seem likely to yield the necessary information to justify an application for a search of any premises.

Finally, Mott opined that to subpoena Ella Shipp before a grand jury would prove fruitless since it was most unlikely that as the head of a criminal enterprise she would testify voluntarily about her role and that of alleged confederates and that, even were immunity from prosecution granted, in view of her status she would rather accept a contempt sentence than testify.

Agent Mott's detailed analysis of various investigations, activities of informants, undercover agents, and surveillance methods indicates a vast ongoing narcotics conspiracy, with its usual secretive nature, the use of code words, clandestine conduct of participants, and methods aimed to deter apprehension of those involved. Despite the strong showing upon which the original wiretap order was issued by Judge Edelstein, the defendants argue that there was not a sufficient exhaustion of investigative techniques, and that there should have been further physical surveillance, follow up leads provided by pen registers, search warrants, arrests and a grand jury inquiry before applying for a wiretap order.[27] Their Monday morning quarterbacking as to what investigative techniques the agents should have employed in addition to what they did employ is utterly unrealistic, if not naive. "An affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every other possible means of investigation has not been exhausted."[28] Agents are not required to resort to measures that will be clearly unproductive.[29] A reasoned explanation, grounded in the facts of the case, and which "square[s] with common sense,"[30] is all that is required. This was not the "small time narcotics case" addressed by the Court of Appeals in *United States v. Lilla*,[31] upon which defendants rely so heavily; rather, the government reasonably alleged a "'fair flung ... conspiracy involving numerous unknown persons'"[32] whose identities may be discovered by wiretap consistent with Congress' intent in enacting the exhaustion requirements. The record does not support the claim that the government acted in bad faith by failing to pursue additional investigative leads in an effort to make the necessity of a wiretap inevitable.[33] The judg-

---

**27.** *See* Memorandum of McAvoy Shipp at 14 n. 5, 15–16.

**28.** *United States v. Terry,* 702 F.2d 299, 310 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

**29.** *Id.*

**30.** *United States v. Lilla,* 699 F.2d 99, 105 (2d Cir.1983). Congress clearly intended that "the showing be tested in a practical and common-sense fashion." S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2190.

**31.** 699 F.2d 99, 104 (2d Cir.1983).

**32.** *Id.* at 105.

**33.** Mac Shipp's attack upon Agent Mott's claim that further efforts by undercover agents would expose them to danger relies principally on the fact that "at a later point in the investigation, (long after the wiretaps had been obtained), the agents were utilized again to enter into negotiations with Ella Shipp." Memorandum of McAvoy Shipp at 13. The government's conduct months after the wiretap application, however,

ment of the agents that subpoenaeing Ella Shipp before a grand jury would result in a wall of silence even at the risk of contempt accords with common experience. The Court finds that a proper basis existed for a finding, with respect to the initial wiretap order, that normal investigative techniques had failed, were likely to do so, or were too dangerous.

Defendants claim that even if the initial wiretap was authorized, the extension was not, since another informant, "Source B," who was connected to one of Ella Shipp's New York suppliers, had been discovered during the initial period of wiretap surveillance, and that therefore normal investigative techniques would have been productive following termination of the initial tap. Upon the argument defendants did not dispute that, like Source A and Agent Domine, Source B was only a "small-time customer" in the New York drug world and not in a position to infiltrate the supplier's organization. Moreover, the danger of detection had markedly increased. According to Agent Mott's affidavit supporting the extension application, defendant Frierson had "actually detected surveillance on one occasion," and had informed McAvoy Shipp that physical surveillance was being used.[34] These facts fully support the required finding concerning investigative techniques with respect to the wiretap extension order.

## C. NOTIFICATION OF "PERSONS KNOWN" IN THE WIRETAP APPLICATIONS

The wiretap statute provides that "[e]ach order authorizing or approving the inter-

ception of any wire or oral communication under this chapter shall specify ... the identify of the person, if known, whose communications are to be intercepted."[35] Section 2518(10)(a)(i) expressly prohibits the use at trial of the contents of any intercepted wire communication or any evidence derived therefrom if "the communication was unlawfully intercepted." The intercept order did name Ella Shipp as the person whose telephone was to be tapped.[36] However, it did not identify Stitmon, Moreland or others as parties to the conversations over the tapped wire. The defendants argue that their identities were known since the investigative authorities had probable cause to believe that they too were committing the offense that was the subject of the wiretap order and that their conversations would probably be intercepted once the order was in effect.[37]

Because specification of all known subjects of a wire tap is not required by the Fourth Amendment,[38] the sole ground for suppression for failure to comply with the provision requiring specification of known subjects is the wiretap statute itself, as defendants here urge. In *United States v. Donovan*,[39] the Court held that the failure to comply with the identification requirement does not render unlawful an intercept order that in all other respects satisfies the statutory requirement, and absent a showing that the government agents "knowingly failed" to identify a subject, the prosecution was free to use the statements.[40]

No showing of "knowing failure" has been made here. The failure as to

hardly dispels a reasonable inference of danger at the time of the application.

**34.** *See* Affidavit of Michael F. Mott in Support of Application Authorizing the Extension of the Interception of Wire Communications [hereinafter cited as Mott Aff. No. 2] at ¶ 35.

**35.** 18 U.S.C. § 2518(4)(a) (1982).

**36.** *See United States v. Kahn,* 415 U.S. 143, 155, 94 S.Ct. 977, 984, 39 L.Ed.2d 225 (1974).

**37.** *See United States v. Chiarizio,* 525 F.2d 289, 292 (2d Cir.1975) (cited with approval in *United*

*States v. Donovan,* 429 U.S. 413, 423 n. 11, 97 S.Ct. 658, 666 n. 11, 50 L.Ed.2d 652 (1977)).

**38.** *See Berger v. New York,* 388 U.S. 41, 59, 87 S.Ct. 1873, 1883, 18 L.Ed.2d 1040 (1967); *see also United States v. Donovan,* 429 U.S. 413, 427 n. 15, 97 S.Ct. 658, 667–68 n. 15, 50 L.Ed.2d 652 (1977) (specifying Fourth Amendment limitations on wiretap orders).

**39.** 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

**40.** *Id.* at 432, 436 n. 23, 439, 97 S.Ct. at 670, 672 n. 23, 673.

Stitmon is technical. Although Stitmon is not specified in the wiretap order itself, he is mentioned in the application. The omission as to Moreland also appears to be an oversight. Moreover, as the Court noted in *Donovan,* to justify suppression the government's "knowing failure" must be "for the purpose of keeping relevant information from the District Court that might have prompted the court to conclude that probable cause was lacking." [41] In light of the overwhelming facts indicating probable cause, discussed above, there is no basis for asserting that the fact of Stitmon's or Moreland's status as targets of the intercept orders would have had any effect on the decisions to order or extend a wiretap.

### D. MARITAL PRIVILEGE

 Stitmon, claiming a marital relationship to Ella Shipp, argues that conversations with her must be suppressed as inadmissible under the marital privilege.[42] Apart from the fact that the alleged relationship is dubious, Stitmon's claim is without merit. Transcripts of the allegedly privileged conversations reveal extensive discussions of matters that may reasonably be inferred to concern drug dealings;[43] these discussions are outside the protection of the privilege.[44]

The motions to suppress evidence derived from the wiretaps are denied.

### II

### THE MORELAND MOTION TO SUPPRESS EVIDENCE

 Defendant Moreland moves to suppress the physical evidence seized pursuant to search warrants issued by Magistrate Jack Streepy of the Northern District of Ohio on March 23, 1983, which authorized searches of her home in Bainbridge Township, Ohio, and of her person. Moreland claims the warrants were not backed by probable cause to believe evidence of criminal activity would be found by such searches.

The thirty-two page affidavit of Special Agent Richard A. Wrenn details information relating to Moreland's drug operations garnered by five anonymous informants, physical surveillance, publicly available information, and records of telephone pen registers. Admittedly, much of the information concerns the existence of contraband at three establishments other than Moreland's residence—the premises at 3289 East 125th Street, Cleveland, Ohio, allegedly used by one Strickland (the "Strickland stash pad"); the upper floor of the Club Seville, 4545 East 131st Street, Garfield Heights, Ohio ("the Club"); and the premises at 3436 East 130th Street, Cleveland, Ohio (the "dope house"). Yet two informants provided information directly indicating that drugs or records thereof were at the Moreland residence in Bainbridge Township or on Moreland's person. "Source 1" stated Moreland kept drugs at that home and transported drugs in her girdle. "Source 5" stated Moreland received a large quantity of heroin from New York on March 11, 1983, and that the heroin was delivered to her house in Bainbridge Township.

---

**41.** *Id.* at 436 n. 23, 97 S.Ct. at 672 n. 23.

**42.** The wiretap statute affirms that "[n]o otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character." 18 U.S.C. § 2517(4) (1982).

**43.** Transcripts of the November 3, 1982, and November 6, 1982, conversations between Ella Shipp and Stitmon, prepared by the FBI and offered by Stitmon for consideration in connection with this motion reveal numerous references to Ella Shipp's sale of a product on consignment and to Stitmon's agreement to collect funds from Wilkinson to pay off the obligations to suppliers. *See, e.g.,* Transcript of November 3, 1982, Conversation at 51–53; Transcript of November 6, 1983, Conversation at 5.

**44.** *See, e.g., United States v. Mendoza,* 574 F.2d 1373, 1381 (5th Cir.1978). Although the Court does not rely upon this ground, it is at least ambiguous from the record whether Stitmon was married to Ella Shipp at any of the times he spoke to her over a wiretapped telephone. There is evidence that Ella Shipp was married to but never divorced from McAvoy Joseph Shipp.

Under the Supreme Court's decision in *Illinois v. Gates*,[45] the facts alleged support issuance of the warrants. As the Court reaffirmed, "an affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.'"[46] Numerous grounds exist for crediting the informant hearsay related in the Wrenn affidavit. First, both Source 1 and Source 5 had provided information in other criminal investigations that led to the arrest of several individuals and the recovery of $77,000 in stolen property. Source 1 also provided information about illegal activities at the dope house and the Club; these activities were corroborated by the hearsay statements of Sources "2," "3," and "4." Illegal activities at the dope house were further confirmed when, after a strip search, Source 2 entered the house and returned to awaiting law enforcement agents with narcotics. Source 5's hearsay assertion—which also related that Strickland was to pick up the March heroin delivery from Moreland's home in Bainbridge Township—is supported by numerous phone calls during the February-March period from the Moreland home to Strickland's residence. In addition, further evidence indicating the presence of narcotics or the proceeds of drug sales was provided in the hearsay statements of Source 2 to the effect that Moreland had become concerned with keeping large amounts of cash at home and that Source 2 had informed her of persons who could build a safe or a false wall in her house.

These facts, related in the Wrenn affidavit, provide a substantial basis for the required finding of probable cause under the "totality of the circumstances" test enunciated in *Gates*.[47] The motion to suppress is denied.

III

## DEFENDANT STITMON'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND TESTIMONY

Defendant Stitmon moves to suppress physical evidence seized from the hotel room where he was arrested and statements made by him shortly after his arrest both in the room and at FBI headquarters. An evidentiary hearing was held at which the sole witness was Special Agent J. Michael Ray of the Cleveland office of the FBI. Agent Ray's testimony may be briefly summarized. On September 8, 1983, at 6 a.m., six armed federal law enforcement officers, including agent Ray, arrived at the Lancers' Motel in Cleveland, Ohio with a warrant for Stitmon's arrest. They positioned themselves outside Room 219. Agent Ray knocked on the door, stated his name, and said he wanted to talk to Stitmon about one Billy Cox. Stitmon opened the door. The agents entered and informed Stitmon he was under arrest in connection with narcotics charges emanating from this district. The agents permitted Stitmon to dress. Agent Ray informed Stitmon of his constitutional rights as defined in *Miranda*,[48] which Stitmon acknowledged he understood.

Other agents obtained the identities of two women present in the room with Stitmon. One of the agents found a "green tablet" on the nightstand, seized it, and reported this to Agent Ray. Agent Ray handcuffed Stitmon's hands behind his back. Stitmon said he wanted to take some cash with him and gestured toward a dresser drawer. Agent Ray and another agent opened the drawer. Amongst the "clutter" in the drawer there were several yellow and green capsules and a foil package molded in the shape of two cigarettes placed side by side, which the agents

**45.** —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**46.** *Id.* 103 S.Ct. at 2334 (*quoting Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)).

**47.** *Id.* 103 S.Ct. at 2335; *see also id.* at n. 13 (Seemingly "innocent behavior frequently will provide the basis for a showing of probable cause.").

**48.** *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

seized. Agent Ray, from the outside appearance of the foil packet, based upon his experience, believed it contained contraband, marijuana cigarettes or joints, and when it was opened two cigarettes were found.[49] Stitmon then asked the two women for cash and told them to contact one "Shannon." Stitmon was taken from the room at approximately 6:18 a.m., was once again advised of his rights, and was placed in a police car.

During the twelve or thirteen minute ride to the FBI headquarters in Cleveland, Stitmon complained about the fit of the handcuffs and he was informed they would be removed at the earliest practical moment following arrival at the FBI headquarters. When they reached the FBI headquarters the handcuffs were removed. Agent Ray testified that while there were slight marks on Stitmon's wrist, there was no unusual redness or swelling and that the handcuffs did not appear to cause Stitmon any unusual pain or discomfort. Agent Ray testified that at about 6:35 a.m. Stitmon was given an "Advice of Rights Form"; that he was asked to and did read aloud the "rights" form clearly and without difficulty. He again acknowledged that he understood his rights. The agents asked if he had a lawyer and he replied that he did not know. At no time did he ask for a lawyer. He was advised of the waiver section and asked if he was willing to sign it and he did. It reads:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

After signing the form, Stitmon was taken to an adjoining room to be fingerprinted and photographed. While this process was in progress, Agent Ray was informed that three individuals—Cox, "Hill" and "Tippy" had not been apprehended following the issuance of warrants for their arrest. After the fingerprinting process had been completed, Stitmon was seated and was given a cup of coffee by the agents. Ray asked him about the three fugitives. Stitmon said that Tippy was his sister-in-law and that the most likely place to find her would be at her mother's in Georgia. Stitmon also said he thought Tippy was an FBI agent and wondered if she were dead. Ray testified that at this time Stitmon was alert and aware of what he was discussing.

Thereafter, at FBI headquarters, Stitmon was told that he would be arraigned that day and, in response to Stitmon's interest in posting bail, Agent Ray told Stitmon that his responses to the U.S. Marshal's office's questions about his background would help him in the bail proceedings. Agent Ray also testified that he told Stitmon about "substantial sentences" and that it was in Stitmon's interest to "cooperate." Agent Ray represented, however, that he had no authority to make any promises.

On cross-examination Agent Ray testified that the night before Stitmon's arrest he had learned that Stitmon had been arrested twice before, but he had no knowledge of any pending charges against Stitmon in the state court and that he had made no effort during his contact with the defendant to determine if any indictments were pending. Stitmon himself did not volunteer any information about any other charges pending against him.

Stitmon moves to suppress the physical evidence on the ground that it was seized without a warrant and that no exception to the warrant requirement applies. He seeks to suppress his statements on the ground that his waiver of rights guaranteed by the Fifth and Sixth Amendments was not voluntary under *Miranda*[50] and its progeny, and that the government fur-

---

**49.** At the time of the hearing, Agent Ray testified he knew of no laboratory tests that had been conducted to confirm that the cigarettes contained marijuana.

**50.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ther violated his Sixth Amendment right to counsel by questioning him during the pendency of a state law criminal charge in connection with which he alleges he was represented by counsel.

## A. FOURTH AMENDMENT

Stitmon's motion raises three distinct Fourth Amendment problems—that presented by seizure of the pill on the nightstand; that posed by seizure of the capsules in the dresser drawer; and that raised by the opening of the foil packet. In response, the government argues that, assuming without conceding the illegality of the searches, the use of the evidence upon the trial is not precluded for impeachment purposes if, as in *United States v. Havens*,[51] the defendant takes the stand in his own defense.[52] The government has represented that it will not use the items seized in its case in chief, but reserves its impeachment right under *Havens*; it is therefore unnecessary at this time to consider the applicability of the various exceptions to the warrant requirement as to the three seizures.[53] The motion to suppress the physical evidence is denied.

## B. VOLUNTARY WAIVER

 It is well established that the government has the burden of proving by a preponderance of the evidence that any in-custody inculpatory statements or waivers of rights to counsel made by a defendant are knowing and voluntary.[54] The government readily sustained that burden. Agent Ray's testimony was forthright and con-vincing. It carried the mark of credibility. The proof abundantly established that the defendant was advised of his rights on three occasions and that he fully understood his rights.

 That the defendant was arrested at an early hour by agents with drawn guns is not evidence of unacceptable law enforcement activity given the nature of the suspected offense, and that the arresting agents had been informed that Stitmon was dangerous and armed at times. There is no evidence that the defendant, who had been arrested twice before, was unduly disoriented or intimidated. To the contrary, the evidence establishes that the arresting officers entered his room peacefully; that no physical force was used; that the arrest was carried out without incident; and that Stitmon was fairly treated from the time of his arrest until the processing was completed. The defendant, with his arrest experience, was aware of his right to bail, and was asked routine questions relating to that right. There is no basis for any claim that defendant was threatened, coerced, mentally or physically, or promised leniency that resulted in his making the statements sought to be suppressed. Based on the evidence relating to the numerous factors relating to voluntary waiver,[55] the Court finds that any statements the defendant did make at the time of his arrest or shortly thereafter at FBI head quarters were knowing, free from coercion of any kind, and entirely voluntary.

51. 466 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

52. *Id.* at 627, 100 S.Ct. at 1916.

53. These exceptions include searches incident to arrest, *see United States v. Gomez,* 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Agapito,* 620 F.2d 324, 335 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), pursuant to consent, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Lopez-Diaz,* 630 F.2d 661, 666 (9th Cir.1980); *United States*

*v. Diaz,* 577 F.2d 821, 823 (2d Cir.1978), and of containers the contents of which are reasonably revealed to the public eye, *see Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979); *United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981).

54. *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972).

55. *United States v. Rubio,* 709 F.2d 146, 153 (2d Cir.1983); *see United States v. Silva,* 715 F.2d 43, 49 (2d Cir.1983); *United States v. Tingle,* 658 F.2d 1332, 1336 n. 5 (9th Cir.1981); *United States v. Dohm,* 618 F.2d 1169, 1174 (5th Cir. 1980).

## C. RIGHT TO COUNSEL

██ Notwithstanding the foregoing findings, as the Supreme Court has ruled, the government violates a defendant's Sixth Amendment right to counsel when, following an indictment it "intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." [56] Stitmon argues that the proscriptions of *Massiah v. United States,*[57] and *United States v. Henry,*[58] apply to information gathered by Agent Ray because charges were pending in state court at the time of Stitmon's arrest. Agent Ray's testimony established he was unaware of the pending state indictment and, contrary to the position of defendant, neither *Massiah* nor *Henry* suggest that law enforcement officers are under an affirmative duty to determine the status of prosecutions in other jurisdictions. Defendant offered no indication of how the state law charge might possibly be proved by the information elicited from Stitmon or of any other connection between the state and federal proceedings. Given these facts, no violation of Stitmon's constitutional rights is shown.[59]

The motion to suppress Stitmon's post arrest statements is therefore denied.

## IV

### MOTIONS FOR DISMISSAL OR SEVERANCE

Defendants Burch, Stitmon and Moreland move for dismissal upon a contention that joinder was not proper under Rule 8(b) of the Federal Rules of Criminal Procedure, or in the alternative for separate trials under Rule 14 upon a claim that at a joint trial they will suffer from prejudicial "spillover"; that post arrest statements of others will incriminate them; or that a codefendant may give favorable testimony on their behalf at a separate trial. The respective claims are without substance.

██ Rule 8(b) clearly justifies joinder of the defendants in the single count conspiracy—it provides for joinder in the same indictment of alleged participants "in the same act or transaction or in the same series of transactions constituting an offense or offenses." Here a single conspiracy is charged in which each defendant allegedly played a role in the same act or series of acts. The fact that some are alleged to have played major roles and others minor parts is of no significance with reference to the basic charge of a conspiracy based upon the totality of those acts in relation to one another. It may be accepted on this motion, as Stitmon contends, that he played a lesser role than Ella Shipp or other codefendants in the furtherance of the conspiracy. This, however, does not release him from his role as a participant in the series of transactions upon which the conspiracy charge is based. And this applies equally to the other movants, whatever the degree of participation in the alleged conspiracy. Their joint indictment in the single count conspiracy charge was well within the requirements of the Rule. The motion to dismiss for misjoinder under Rule 8(b) is denied.

The defendants next contend, even if joinder was proper, that separate trials should be granted under Rule 14 because of the prejudice that will arise if they are tried together. The general rule in our Circuit, repeatedly upheld, is "that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried." [60] This is "particularly so

---

**56.** *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980).

**57.** 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

**58.** 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

**59.** *See United States v. Pineda,* 692 F.2d 284, 287–88 (2d Cir.1983); *see also United States v.*

*Calhoun,* 669 F.2d 923, 925 (4th Cir.) (*Massiah* does not apply if statements are elicited concerning a "distinct and separate offense" from that for which defendant has been indicted), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982).

**60.** *United States v. Ventura,* 724 F.2d 305 at 312, No. 83–1080, slip op. at 7455 (2d Cir.Dec. 13, 1983) (citing *United States v. Lyles,* 593 F.2d

where the indictment charges a conspiracy or a crime which may be proved against all the defendants by the same evidence and which results from the same or a similar series of acts." [61] The rule of single trials of persons jointly indicted "conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials." [62]

■■■ Stitmon seeks to overcome the force of the rule upon a claim that he will be prejudiced by a joint trial because the evidence against him under the conspiracy charge is relatively attenuated and hence there will be a "spillover" impact upon him from the more extensive evidence presented against the major defendants. However, without more this is not a ground for a separate trial. "[D]iffering levels of culpabilities and proof are inevitable in any multi-defendant trial, and standing alone, are insufficient grounds for separate trials." [63] The evidence to be presented against Stitmon is straightforward, based upon conversations between him and Shipp with respect to sales and purchases of heroin and cocaine. Such evidence permits jury consideration under proper instructions designed to prevent a spillover effect.

Citing *Kotteakos v. United States,*[64] all movants raise a separate "spillover" prejudicial impact contention. Here they advance the now common "garden variety" argument in conspiracy cases [65] that the proof thus far relied upon by the government discloses multiple conspiracies rather than the single conspiracy charged in the indictment—one conspiracy with respect to the New York operations and another as to Cleveland area activities; accordingly, they further argue there will be a prejudicial spillover impact upon a joint trial. The government contends that its proof upon a trial will establish the single, overall, ongoing conspiracy as alleged in the single count indictment. The issue is clearly one of fact to be determined by the jury. If required, upon the trial proper instructions will be given to the jury for its determination of the issue.[66] The ultimate question is "whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct." [67] The Court has no doubt that a properly instructed jury will be able to compartmentalize the evidence against each defendant and render a fair verdict as to each. Since consideration of judicial economy strongly favors a joint trial here, and substantial prejudice has not been shown, the motion for severance on

182, 191 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Taylor,* 562 F.2d 1345, 1362–63 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977)).

**61.** *United States v. Kahaner,* 203 F.Supp. 78, 80–81 (S.D.N.Y.1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

**62.** *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir.1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971).

**63.** *United States v. Carson,* 702 F.2d 351, 367 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983).

**64.** 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**65.** *See United States v. Terry,* 702 F.2d 299, 315 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. McGrath,* 613 F.2d 361, 367 (2d Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980).

**66.** *See United States v. Tramunti,* 513 F.2d 1087, 1107 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *see also United States v. Cambindo Valencia,* 609 F.2d 603, 625 (2d Cir.1979) (outlining circumstances in which charge must be given regarding multiple conspiracies), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980).

**67.** *United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

the basis of prejudicial spillover is denied.[68]

Finally, the defendants advance two other grounds for severance. First, they argue that the introduction of post-arrest statements of other defendants may incriminate them. The government, aware of the *Bruton* rule,[69] represents that if it intends to offer upon the trial any codefendant's post-arrest statement, it will make the necessary redactions to eliminate incriminating references to other defendants.

 Next, Burch and Stitmon respectively contend that if they were tried separately Ella Shipp "would be called" or "could testify" as to exculpatory matter. It is well established, however, that "a mere unexplicated assertion of this sort is not enough."[70] To justify severance on this ground,

> [a] moving defendant must establish (1) a bona fide need for the testimony of his co-defendant, (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege, (3) the substance of his co-defendant's testimony, and (4) the exculpatory nature and effect of such testimony.[71]

The movants have failed to satisfy any of these requirements. Of particular relevance to this case is the rule that "the requirement of a showing of willingness to testify if there is severance is not met when that offer to testify is further conditioned on the codefendant's case being tried first."[72] This, of course, is precisely the strategy being pursued by Moreland and Stitmon. The motions for severance are therefore denied.

## V

### PRETRIAL DISCOVERY MOTIONS

Counsel for defendant Stitmon, joined by some but not all counsel representing other defendants, has made freewheeling catchall motions that comb the discovery process for minutiae of information, much of which has not the slightest relevancy or bearing on the issues presented by this indictment, or seek information as to which the defendants clearly are not entitled. They are so devoid of merit as not to require discussion. The motions are denied except as consented to by the government.

---

**68.** *See United States v. Potamitis,* 564 F.Supp. 1484, 1487 (S.D.N.Y.1983).

**69.** *See Bruton v. United States,* 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1969).

**70.** *United States v. Werner,* 620 F.2d 922, 930 (2d Cir.1980).

**71.** *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir.1983).

