UNITED STATES of America

v.

Matthew IANNIELLO, a/k/a "Matty the Horse," Benjamin Cohen, a/k/a "Benny Cohen," Paul Gelb, Pauline Gelb, Bernard Kurtz, Chester Cohen, Morton Walker, George Vallario, Jr., Carl Moskowitz, Bradford Cohen, Sol Goldman, Alfred Ianniello, Oscar Ianello and Robert Ianniello, Defendants.

S 85 Crim. 116.

United States District Court,
S.D. New York.

Oct. 29, 1985.

As Amended Nov. 12, 1985.

Paul Goldberger, New York City, for Morton Walker.

Gustave H. Newman, New York City, for Carl Moskowitz.

Robert Hill Schwartz, New York City, for Sol Goldman.

Victor Rocco, New York City, for Oscar Ianello; Judd Burstein, Anne Feigus, Roger Parloff, Mark Pomerantz, Mark Somers, of counsel.

Thomas P. Puccio, New York City, for George Vallario, Jr.

Ronald P. Fischetti, Fischetti, Feigus & Pomerantz, New York City, for Bradford Cohen.

John L. Pollok, Hoffman Pollok & Gasthalter, New York City, for Alfred Ianniello.

Gerald L. Shargel, New York City, for Robert Ianniello.

Rudolph W. Giuliani, U.S. Atty., New York City, for the U.S. of America; James B. Rather, Howard E. Heiss, Asst. U.S. Attys., of counsel.

Jay Goldberg, New York City, for Matthew Ianniello.

Al Brackley, Brooklyn, N.Y., for Paul Gelb.

Gerald B. Lefcourt, New York City, for Bernard Kurtz.

Frederick Hafetz, Goldman & Hafetz, New York City, for Benjamin Cohen.

Steven K. Frankel, New York City, for Pauline Gelb.

Eugene Kaplan, New York City, for Chester Cohen.

## OPINION

EDWARD WEINFELD, District Judge.

Fourteen defendants have been indicted upon charges of violating and conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute [1] and committing the crimes of mail fraud, bankruptcy fraud, income tax evasion and conspiracy to commit bankruptcy fraud and tax fraud. In broad outline, the indictment charges that over a six-year period the defendants, in varying combinations, fraudulently operated restaurants and bars under concealed and hidden ownership through "front" companies; submitted false information in support of applications for liquor licenses from the New York State Liquor Authority in order to conceal their actual ownership interests; skimmed from the receipts of such restaurants and bars over two million dollars, which they failed to report to state and federal taxing authorities; made fraudulent statements and kept fraudulent accounts regarding the corporations which operated the bars and restaurants; made false statements and submitted false records in Chapter XI proceedings before the United States Bankruptcy Court for the Southern District of New York; and used the mails to defraud—in sum, the indictment alleges a RICO enterprise which included the fourteen defendants and six corporations that owned the bars and restaurants named in the indictment. In addition to these charges of criminal conduct, the indictment, pursuant to RICO's forfeiture provision,[2] seeks the forfeiture of property or

1. 18 U.S.C. § 1961 et seq.

2. 18 U.S.C. § 1963.

interests acquired by any defendant in violation of RICO. Defendants bring numerous motions, including ones seeking suppression of evidence acquired through a program of electronic surveillance, challenging the legal sufficiency of the indictment, and addressing matters of pretrial and trial procedure.

## I. The Legal Basis of the Surveillance Orders

The government investigation which culminated in this indictment included extensive electronic surveillance of the office premises of C & I Trading, a partnership registered in the names of defendants Matthew Ianniello and Benjamin Cohen. This surveillance, whose legality is challenged by the defendants, was ordered by the district court after an application by the government on August 26, 1982, and was conducted, pursuant to extensions of the original order, through December 27, 1982. Concealed audio and video surveillance equipment was installed at C & I Trading, which occupied a suite of offices on the 18th floor of a building in midtown Manhattan. According to an affidavit submitted by defendant Benjamin Cohen, at the time of the surveillance he and Matthew Ianniello shared a single office within the suite.[3] Other offices within the suite were sublet to lawyers. One of these attorneys, Carl Moskowitz, is named as a co-defendant in this case; two others, not charged with any illegal activity, also subleased offices in the suite at the time the surveillance took place.[4] Defendants challenge the surveillance on numerous grounds, including an alleged extension of the authorization issued by the Assistant Attorney General, the sufficiency of the evidence presented as showing probable cause for the issuance of the surveillance orders, and the legal sufficiency of the order authorizing the use of video surveillance.

### A. Authorization by the Justice Department

Defendants move for the suppression of all evidence resulting from electronic surveillance on the ground of improper authorization. In particular, defendants point to the fact that the Assistant Attorney General's authorization permitted an application for interception of communications "from the offices of Matthew Ianniello and Benjamin Cohen, situated within the premises known as C & I Trading located at 135 West 50th Street, New York, New York," while the application submitted to United States District Judge Tenney requested authority to intercept conversations "of Matthew Ianniello and Benjamin Cohen, and others as yet unknown, occurring within the offices of C & I Trading, 135 West 50th Street."

This claimed variance between communications "from the offices of Matthew Ianniello and Benjamin Cohen" and conversations "of ... Ianniello and ... Cohen ... occurring within the offices of C & I Trading" is, in defendants' view, a fatal violation of the demands of Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[5] which governs the authority of the federal courts to order electronic surveillance. The authorization from the Assistant Attorney General, in defendants' reading, permitted electronic surveillance only in the offices of Cohen and Ianniello within the suite, and was thus more restrictive than the application submitted by the United States Attorney to the district court.

■ Defendants' hypertechnical reading of the Attorney-General's authorization is without foundation. The Assistant Attorney General had before him the proposed order to be submitted to the district court at the time the authorization letter was issued.[6] Thereupon the Assistant Attorney General issued the authorization letter ap-

---

3. Affidavit of Benjamin Cohen, at 2.

4. *Id.* at 1–2.

5. 18 U.S.C. §§ 2510–20. The specific provision requiring authorization by the Attorney General or his designee is found in 18 U.S.C. § 2516(1).

6. Government's Memorandum in Opp., at 8n.*.

proving the application to the district court. Defendants do not claim that this application as submitted to the district court lacked the requisite specificity; rather, they argue that it impermissibly exceeded the authorization. Since the Assistant Attorney General had the proposed application before him when the authorization was issued, this objection is without substance.

In addition, United States District Judge Tenney, who issued the order authorizing the surveillance, did not adopt either the language of the Assistant Attorney General's authorization or that of the application by the Assistant United States Attorney. The order authorized the interception of communications "occurring within the premises known as the offices within C&I Trading, 135 West 50th Street, New York, New York of Matthew Ianniello and Benjamin Cohen and others as yet unknown." [7] The district court independently evaluated the material before it, and issued an order specifying the permitted area of search.

 Moreover, it is clear that variances in wording between or among the authorization letter from the Attorney General, the application to the district court, and the court's order directing surveillance, even assuming they are technical violations of the requirements of Title III, do not mandate suppression of the fruits of the surveillance. The Supreme Court has held that not all violations of the provisions of Title III require suppression. "To the contrary, suppression is required only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the use of this extraordinary investigative device.'" [8]

The statutory provision relevant here requires that

each application for an order authorizing or approving the interception ... shall include the following information: ...

(b) a full and complete statement of the facts and circumstances relied upon by the applicant to justify his belief that an order should be issued, including ... (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted. [9]

Defendants argue that since this provision is intended to implement the Fourth Amendment requirement of particularity, the asserted violation here is within the *Donovan* standard. [10] However, the application *was* specific. If there is any violation at all, it arises from the fact that the authorization by the Attorney General differed slightly from the application presented to and independently evaluated by the district court. This circumstance does not fall within the *Donovan* test. The Supreme Court has said that the congressional purpose underlying the requirement of authorization by the Attorney General was to "condition use of intercept procedures upon the judgment of a senior official in the Department of Justice ..." [11] This review by the appropriate senior official took place. Moreover, as noted above, the district court, in granting the application, made an independent judgment as to the proper wording of the order. In addition, the central purpose of ensuring that applications for wiretap authorization meet the Fourth Amendment's requirement of particularity was also served, both through the specific wording of the application itself and by the affidavit of FBI Special Agent Brian Taylor submitted in support of the application, as required by 18 U.S.C. § 2518(1)(b). The function of measuring the authorization and application against the demands of the statute was performed by Judge Tenney, who was provided with

7. Order, 8/26/82, at 3.

8. *United States v. Donovan*, 429 U.S. 413, 433–34, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977), *quoting United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

9. 18 U.S.C. § 2518(1).

10. Defendants' Joint Pre-Trial Memorandum of Law, at 14 n. 11.

11. *Giordano*, 416 U.S. at 527, 94 S.Ct. at 1832.

all the information required both by the statute and by the Constitution. Even if the variance in *haec verba* between the authorization and the application was a violation of the technical requirements of Title III, it did not "directly and substantially" impede the implementation of the congressional purpose underlying the statute, and suppression is therefore inappropriate.

## B. Probable Cause for the Surveillance Orders

In its initial application for electronic surveillance at C & I Trading, the government relied upon the affidavit of Brian Taylor, the FBI Special Agent supervising the investigation of Matthew Ianniello and Benjamin Cohen, about whom the initial investigation centered. The essence of the probable cause showing made by Agent Taylor in his affidavit was based upon information received from five unidentified individuals, all of whom had given such information to the FBI regarding alleged loan-sharking activity by Matthew Ianniello and Benjamin Cohen. The only identified informant upon whose information the government relied was James Fratianno, a self-proclaimed former member of the Cosa Nostra, who had previously testified in other proceedings concerning the existence, and structure of this organization. In particular, Fratianno told the FBI at an interview in 1982 that during 1977 he had been introduced to Matthew Ianniello by a third party whom Fratianno knew to be a member of the Cosa Nostra. Fratianno said that he learned at this time that Ianniello was a capo, or lieutenant, in the Genovese Family of the Cosa Nostra, and that one of his enterprises on behalf of the family was a loan-sharking operation.[12]

This information provided by Fratianno was five years old at the time of the application for surveillance; it was supplemented by the testimony of the five anonymous informants designated sources A through E by the FBI. Each of the five informants had some "track record" by which his reliability and accuracy had been judged by the FBI. Each had been providing information about organized crime activities for more than a year; two of the sources had been cooperating with the FBI for more than a decade. In each instance, Agent Taylor averred, information provided by the five sources had been corroborated by subsequent investigation by the Bureau. Agent Taylor swore that three of the five sources are known to the FBI as members of the organized crime syndicate called the Cosa Nostra, and are thus judged by the Bureau to be well-placed to report on activities of other Cosa Nostra members.

Four of these five sources, A, B, C and E, told the FBI agents investigating Matthew Ianniello that they knew from conversations with other people that Ianniello and Benjamin Cohen (identified only as Cohen by one source) ran a loan-sharking business at C & I Trading. Source C told the FBI that he had spoken with one person who had applied to Cohen and Ianniello for a loan at C & I Trading in July 1982. The terms of the loan, if any, were not related.[13] Source E, who said he was personally acquainted with Matthew Ianniello, told the FBI that he had learned from conversations with Ianniello, his associates, and those to whom Ianniello has lent money how Ianniello's loan-sharking business is organized.[14]

The FBI obtained corroboration of these tips to the extent of verifying that C & I Trading was a partnership organized in New York by Matthew Ianniello and Benjamin Cohen, ascertaining that its offices were at the address reported by the informants, and establishing that both Ianniello and Cohen worked at that address.

The defendants contend that the testimony of the anonymous informants was little more than a compilation of unverified hearsay, and that the independent corroboration undertaken by the FBI provided no substantial reason to credit the testimony of the informants. For this reason, they argue, the evidence offered in the original

---

12. Taylor Affidavit, 8/26/82, at 7.

13. *Id.* at 10.

14. *Id.* at 11–12.

application was insufficient to show probable cause for the issuance of the surveillance order by the district court.

The recent decision of the Supreme Court in *Illinois v. Gates*,[15] provides guidance on the review of probable cause decisions based upon the testimony of anonymous informants. In *Gates* the Court reaffirmed its previous holding that "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."[16] "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'"[17]

■ The decision in *Gates* also establishes that while the criteria of "veracity," "reliability," and the informant's "basis of knowledge" are highly relevant elements in determining the value of an anonymous informant's testimony, probable cause must be established upon the totality of the circumstances presented.[18]

■ In this case the district court was presented with the testimony of five anonymous informants of previously established reliability. Each had a substantial history of providing information to law enforcement authorities regarding alleged activities of organized crime; each had provided information in the past which had been subject to corroboration by independent investigation. Furthermore, each informant set out the basis of his knowledge of the alleged loan-sharking activity. Defendants object that much of this evidence was hearsay. This is irrelevant.[19] What is relevant is that Agent Taylor in his summary of the information carefully distinguished between those statements of the informants which were supported by hearsay and those which resulted from personal knowledge; the district court was able to make an independent evaluation of the evidence. Moreover, not all of the evidence supporting the application was hearsay; one informant swore that he had engaged in direct contact and conversations with Ianniello.

In view of the Supreme Court's oft-repeated teaching that probable cause is a "practical, nontechnical conception,"[20] and mindful of the limited scope of the review of the decision of an issuing magistrate who has been provided with "sufficient information ... to allow that official to determine probable cause,"[21] this Court finds, upon the totality of the evidence, that the issuing Court had before it ample evidence to support its finding of probable cause for the issuance and extension of the surveillance order challenged by the defendants.

■ Defendants contend that because the government relied upon unnamed informants for the factual basis of its original probable cause showing the Court should hold a hearing, either in open court or *in camera*, to establish the informants' identities and bases of knowledge. In support of this request, defendants offer the completely unsubstantiated claim that "there is good reason to believe that these informants simply did not exist."[22] Without the slightest factual basis of any kind, defendants in effect accuse of false swearing the Assistant United States Attorney and the Special Agent of the FBI whose affidavits supported the surveillance applications. The charge is utterly unfounded. This free

---

**15.** 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**16.** *Illinois v. Gates,* 462 U.S. at 236, 103 S.Ct. at 2331, *quoting Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960); *see United States v. Harris,* 403 U.S. 573, 577–83 (1971).

**17.** *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331, *quoting Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969).

**18.** 462 U.S. at 230, 103 S.Ct. at 2327.

**19.** *See* Fed.R.Crim.P. 41(c)(1) ("The finding of probable cause may be based upon hearsay evidence in whole or in part."); *United States v. Ventresca,* 380 U.S. 102, 107–08, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).

**20.** *See, e.g., Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

**21.** *Gates,* 462 U.S. at 239, 103 S.Ct. at 2332.

**22.** Defendants' Joint Memorandum of Law, at 26.

and easy casting of aspersions upon the integrity of government counsel is no substitute for the factual demonstration which defendants are required to make before this Court.

Nor, as defendants contend, is the Court required to conduct such a hearing merely because the information provided by confidential sources was the basis for the government's probable cause showing before Judge Tenney. The Supreme Court has repeatedly held that disclosure of the identity of confidential informants is not required, but that such disclosure may be ordered by the trial court in the exercise of its discretion, balancing the defendant's constitutionally-protected interests against the public interest in protecting those who come forward to provide information about criminal wrongdoing.[23] In its most recent interpretation of the Supreme Court's decisions in this area, our Court of Appeals addressed the claim that defendants seized pursuant to an arrest warrant were entitled to the names of informants upon whose information the authorities relied. The district court had conducted an *in camera* examination of the informants; the Court of Appeals held that this was "if anything, considerably more accommodating to appellants' demand than was necessary."[24] This holding is supported by other cases in which the Court has considered and denied requests for disclosure of the identities of informants in cases of warrantless arrests and searches.[25]

While there may be justification for requiring disclosure of informants' identities upon a trial, where essential to a fair determination, the rationale does not apply where, as here, the trial court is presented with an arrest or search pursuant to a valid warrant. Where a warrant has issued, the judicial determination as to probable cause has already been made, and the scope of the trial court's review is limited by the deference due that determination.[26] There can be no doubt that a warrant may legitimately be predicated in part upon information provided by unnamed or even anonymous informants.[27] In view of the Court's finding above that Judge Tenney's surveillance authorizations issued upon probable cause, defendants bear the burden of showing in what specific fashion the government's reliance upon informants, not produced before the issuing judge at the time of the warrant application, prevented the court from making an informed determination as to probable cause.[28] Instead of meeting that burden, defendants have instead made accusations of government misconduct based entirely upon the fertility of their counsel's imaginations. The motion to compel production and examination before the Court of the government's confidential informants is denied.

## C. Alternative Investigative Techniques

Defendants also move for the suppression of all evidence resulting from electronic surveillance on the ground that the government failed in its initial application

---

**23.** See *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). See also *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980) (defendants "bear the burden of demonstrating entitlement"); *In re United States,* 565 F.2d 19, 23 (2d Cir.1977) (same), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978); *United States v. Hyatt,* 565 F.2d 229, 231 (2d Cir.1977) (decision committed to discretion of district court).

**24.** *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The sources in *Manley* provided information relied upon in the execution rather than the issuance of the warrant.

**25.** See, e.g., *United States v. Comissiong,* 429 F.2d 834, 839 (2d Cir.1970); *United States v. Tucker,* 380 F.2d 206, 212 (2d Cir.1967); *United States v. Elgisser,* 334 F.2d 103, 110 (2d Cir.), *cert. denied,* 379 U.S. 881, 85 S.Ct. 151, 13 L.Ed.2d 87 (1964).

**26.** See *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

**27.** See *Gates,* 462 U.S. at 246, 103 S.Ct. at 2336.

**28.** Cf. *United States v. Manley,* 632 F.2d 978, 985 (2d Cir.1980).

to make a showing that normal investigative procedures could not be used, as required by Title III.

Under the statute, the government must show that other "investigative procedures have been tried and failed or ... reasonably appear to be unlikely to succeed if tried or to be too dangerous." [29] The government's showing in this case was concentrated in four paragraphs of the affidavit submitted by FBI Agent Taylor.[30] First, Agent Taylor indicated on the basis of "several brief physical surveillances" of the 18th floor of 135 West 50th Street, where C & I Trading was located, that "prolonged surveillances are virtually impossible on this floor since strangers would be viewed with a great deal of suspicion." The government in opposition to this motion amplifies this point by explaining that physical surveillance would have been unhelpful in any event, since it would have revealed only the comings and goings of the known targets of the surveillance, and not the identities and roles of the other, unknown members of the conspiracy under investigation, or the events that occurred within the premises where the alleged illegal conduct was carried on.[31] Agent Taylor further stated that the anonymous informants in the case were unwilling to testify upon a trial; that "interviews of extortion and loanshark victims [were] not feasible because of the risk that these interviews would alert Ianniello and Cohen to the investigation"; and that search warrants and Grand Jury investigation would be considered in future, but that the government did not have "enough information [at that time] concerning the identities of Ianniello's and Cohen's criminal associ-

ates and victims or of the details of their operation for a Grand Jury investigation to be effective."

In requiring a showing that alternative techniques of investigation would not suffice, Congress clearly intended that "the showing be tested in a practical and commonsense fashion." [32] "A reasoned explanation, grounded in the facts of the case, and which 'square[s] with common sense,' is all that is required." [33]

Defendants rely upon the decision of our Court of Appeals in *United States v. Lilla*,[34] which overturned a warrant for wiretap surveillance. *Lilla* presented, however, a "small time narcotics case," [35] in which state police chose to use a telephone tap in the investigation of the activities of a single drug dealer where a simple, direct investigative proceeding was available, with the prospect of results. Here the government was engaged in investigating a large-scale criminal enterprise, carried on in substantial secrecy and which allegedly did not hesitate to use violence to secure the protection of its clandestine illegal activities. Moreover, the targets of the investigation had been identified by the government as experienced professional criminals, attuned to the activities of law enforcement personnel and capable of capitalizing on any early warning of investigations aimed at their own enterprises.

It was in this context that the government put forward its reasons for believing that alternative investigative procedures would be inadequate. The prospect of exposure of the investigation underlay the rejection of interviews with alleged victims of loan-sharking, and made physical sur-

---

**29.** *See* 18 U.S.C. § 2518(1)(c). The issuing judge must make an independent determination on this point in support of the surveillance order. 18 U.S.C. § 2518(3)(c).

**30.** Taylor Affidavit, 8/26/82, at 13.

**31.** *See United States v. Shakur*, 560 F.Supp. 318, 325 (S.D.N.Y.1983); *United States v. DePalma*, 461 F.Supp. 800, 812 (S.D.N.Y.1978).

**32.** S.Rep. No. 1097, 90th Cong. 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2190.

**33.** *United States v. Shipp*, 578 F.Supp. 980, 989 (S.D.N.Y.1984) (*quoting United States v. Lilla*, 699 F.2d 99, 105 (2d Cir.1983)), *aff'd*, 754 F.2d 1427 (2d Cir.1985).

**34.** 699 F.2d 99 (2d Cir.1983).

**35.** *United States v. Shipp*, 578 F.Supp. 980, 989 (S.D.N.Y.1984), *aff'd*, 754 F.2d 1427 (2d Cir. 1985).

veillance of C & I Trading inadvisable. Testimony of informants, including James Fratianno, linked members of the Cosa Nostra to assaults upon and the murder of witnesses. Under these circumstances, the government was justified in its view that it was dangerous to attempt infiltration or other undercover activity against Ianniello, who it asserted was a member of the Cosa Nostra. It was not necessary for a vicious assault or murder to occur before the government decided not to risk the physical well-being of its agents.[36]

Defendants make much of the government's decision not to send an undercover agent to the offices of C & I Trading to apply for a loan. In answer to the government's argument that such a course of action would have been dangerous to the agent, they suggest that the agent could have been introduced as a bona fide loan customer by one of the anonymous informants who claimed to be familiar with Ianniello's enterprise. The government is no more required to risk the physical safety and continued usefulness of its confidential informants, however, than it is to risk the safety of its agents.[37] Moreover, the government rightly points out that placing an agent in a position to go through a single loan transaction would not substantially have furthered its investigation. Whether or not the agent were subsequently threatened, the transaction would not have afforded a significant opportunity to discover the identities and roles of persons who may have been involved in the alleged overall conspiracy the government believed it was investigating. "Agents are not required to resort to measures that will clearly be unproductive."[38] The government made the required showing that alternative investigative techniques were not available,

on grounds of both ineffectiveness and dangerousness. It was not required to show that it had exhausted all other possible avenues of investigation.[39] Defendants' motion to suppress on this ground must be denied.

### D. Video Surveillance

Defendants also challenge the government's use of concealed video recording equipment at the premises of C & I Trading to observe the non-verbal conduct of individuals. The three concealed video cameras, which were placed along with the concealed microphones, or "bugs," which monitored the content of conversations, were located in the office shared by defendants Matthew Ianniello and Benjamin Cohen, the conference room and law library of the suite, and the "general office area" at the center of the suite. Judge Tenney was presented by the government with the application for video surveillance at the same time, and upon the same record, as the application for audio surveillance, and the order he issued covered both kinds of electronic surveillance at C & I Trading.

Defendants contend that the video surveillance ordered by Judge Tenney was invalid for two reasons: first, because searches cannot constitutionally be conducted without specific statutory authorization for the issuance of a warrant, and no statute, including particularly Title III, authorizes the use of video surveillance; and second, alternatively assuming that Title III does govern the use of video surveillance, that the requirements of Title III were not met here.

Only one Court of Appeals has as yet addressed the issue of video surveillance in domestic criminal investigations. In *United States v. Torres*[40] the Seventh Circuit,

---

**36.** *See United States v. Shipp,* 578 F.Supp. at 989 (threat that Shipp would kill anyone who "screw[ed] her over" justified decision to withdraw undercover agent).

**37.** *See United States v. Esposito,* 423 F.Supp. 908, 912 (S.D.N.Y.1976).

**38.** *United States v. Terry,* 702 F.2d 299, 310 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

**39.** *Terry,* 702 F.2d at 310; *United States v. Todisco,* 667 F.2d 255, 258–59 (2d Cir.1981), *cert.denied,* 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982).

**40.** 751 F.2d 875 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

in an extensive opinion by Judge Posner and an equally thorough concurrence by Judge Cudahy, held that the admission of videotape evidence acquired pursuant to a warrant authorizing the use of video as well as audio surveillance of a suspected terrorist bomb factory was constitutionally permissible. The majority and concurring opinions agreed upon a number of fundamental questions. There was complete agreement that, in the absence of any specific statutory authorization, warrants for video surveillance could be issued by a district court under the authority of Rule 41 of the Federal Rules of Criminal Procedure and the inherent powers of common-law courts.[41] In addition, both the majority and the concurring judge agreed that Title III did not by its terms expressly authorize video surveillance in the context of a domestic criminal investigation; at the same time, both also agreed that the standards set out by Title III established guidelines for the Fourth Amendment review of video surveillance activities.

■ Where the majority and concurring views in *Torres* differed, however, was over the question whether all the commands of Title III applied to government use of video surveillance. Judge Posner, writing for the majority, isolated four of the elements of the Title III regulatory scheme which, in the majority's view, incorporated the Fourth Amendment demands assuring the constitutional validity of the search: the requirements that normal investigative procedures be shown to have failed or to be unlikely to succeed; that the warrant describe the type of communications to be intercepted and the offense to which they relate; that the period of interception not exceed the time necessary to acquire the relevant information, and in any event not exceed thirty days; and that the interception be conducted so as to minimize the seizure of non-pertinent or privileged communications.[42] An order meeting these requirements, the Court held, would meet the Fourth Amendment prohibition of general searches.

The concurring opinion, on the other hand, would have applied the restrictions of Title III *in toto* to the issuance of video surveillance warrants. While acknowledging that Title III itself did not authorize video surveillance, Judge Cudahy found in the provisions of the Foreign Intelligence Surveillance Act ("FISA")[43] both coverage of video surveillance in the context of national security investigation of foreign intelligence agents operating in the United States and a clear indication of congressional intent to create "a comprehensive and exclusive system of control" of electronic surveillance in both FISA and Title III.[44]

The opinion of the Seventh Circuit Court of Appeals in *Torres*, while not binding upon this Court, is entitled to great deference. After careful consideration of the extensive opinions and the authorities cited therein, the Court concludes that the *Torres* majority's reasoning is sound. The ultimate question in all search and seizure determinations is whether the search at issue met the fundamental standards of the Fourth Amendment. Statutory provisions and prior decisional authority, where available, will bind the determination in particular cases, but in this area of the law, where the factual context is of dominant importance, courts must of necessity confront repeatedly the task of applying established principles to constantly changing conditions. In enacting Title III Congress considered numerous objectives, including, but not limited to, the demands of the Fourth Amendment. The achievement of those other objectives in the field of video surveillance is a task for Congress, not for this Court.

■ With respect to the fundamental Fourth Amendment standards set out by the Seventh Circuit in *Torres*, it is clear

---

**41.** *See* 751 F.2d at 877–80; *id.* at 887 (Cudahy, J., concurring).

**42.** *See* 751 F.2d at 883–84.

**43.** Pub.L. No. 95–511, 92 Stat. 1783, *codified at* 50 U.S.C. § 1801 *et seq.*

**44.** *Torres,* 751 F.2d at 887 (Cudahy, J., concurring).

that the surveillance in this case was proper. The application before Judge Tenney met the four requirements identified by Judge Posner: the application made the necessary showing that alternative investigative techniques were not available, described the non-verbal conduct to be surveyed, was limited to a thirty-day period, and was governed by the same minimization orders used in the execution of the audio surveillance. The video surveillance application was also specifically approved by the Assistant Attorney-General who authorized the application for audio surveillance under Title III. For these reasons, under the analysis of the Seventh Circuit in *Torres,* Judge Tenney's video surveillance order withstands constitutional challenge.

Defendants contend, however, that the surveillance did not comply with certain requirements of Title III for violation of which, in an audio surveillance context, suppression would be the mandatory remedy. In particular, defendants point out that the government did not submit its videotapes to the district court for sealing, as is required for Title III surveillance materials under 18 U.S.C. § 2518(8)(a).[45] The government concedes that some of its videotapes resulting from the surveillance at C & I Trading were not presented to the district court for sealing, and indeed have not been sealed to date, three years after their creation. The first set of videotapes, which had inadvertently recorded conversations on their audio tracks, were sealed; subsequently, when the video recorders had been modified to prevent any further interception of audio communications by this equipment, the tapes were not presented to the district court, but were instead

sent directly to an FBI evidence vault.[46] The government's only explanation for its failure to seal these videotapes is that it relied upon its belief that video surveillance is not covered by the provisions of Title III and hence there is no requirement for sealing by the Court.

■■■ Our Court of Appeals has previously held that failure to present to the district court for sealing the fruits of audio surveillance under Title III requires suppression of the tapes.[47] The Court of Appeals' holding in *Gigante* was explicitly based upon the statute itself; it did not establish a requirement based directly upon the Fourth Amendment as applied to electronic surveillance. The legislative history of Title III reveals that, with respect to the sealing requirement, Congress recognized that "[m]ost law enforcement agency's [sic] facilities for safekeeping will be superior to the court's and the agency normally should be ordered to retain custody, but the intent of the [sealing] provision is that the records [of intercepted communications] should be considered confidential court records."[48] This expression of congressional intent, while demonstrating that Congress was concerned with measures to ensure the integrity and reliability of surveillance evidence, also shows that the objectives served by the sealing requirement were objectives other than that of compliance with the fundamental requirements of the Fourth Amendment. There can be no doubt that it is important to assure the integrity of evidence presented in our courts; it is for this reason that authentication of evidence is required under the Federal Rules of Evidence,[49] but this is not one

---

**45.** Section 2518(8)(a) provides in pertinent part that:

Immediately upon the expiration of the period of the [surveillance] order, or extensions thereof, such recordings [of the content of intercepted communications] shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for in this subsection, or a satisfactory explanation of the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or the evidence derived therefrom.

**46.** *See* Government's Memorandum of Law, at 67.

**47.** *United States v. Gigante,* 538 F.2d 502 (2d Cir.1976).

**48.** S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2193.

**49.** *See* Fed.R.Evid. 901.

of the objectives of the Fourth Amendment. *Gigante* was decided by our Court of Appeals upon an analysis of the full range of objectives Congress sought to achieve in enacting Title III. The Court's present concern is with the elements of that congressional determination which directly answer to the demands of the Fourth Amendment. On this basis, the Court holds that the government was not required to submit the videotapes to Judge Tenney for sealing. Accordingly, defendants' argument based upon the government's failure to seal the tapes must fail. The motion to suppress the video surveillance is denied.

## II. The Execution of the Surveillance Orders

Defendants also move to suppress the fruits of the electronic surveillance conducted by the government on the ground that, in numerous respects, the government did not execute the surveillance orders issued by Judge Tenney in compliance with the demands of Title III and the orders themselves. The defendants argue that the agents conducting the monitoring of conversations and conduct occurring within the offices of C & I Trading failed to minimize the extent of the intrusion as required by Title III.[50] In particular, defendants contend, the surveillance did not meet the statutory minimization requirement in two respects: first, the agents assertedly did not minimize interception of conversations occurring at Monday evening "sit-downs," also described as card games, conducted in the conference room at C & I Trading; and second, the agents allegedly did not make any attempt to minimize their interception of conversations in which Matthew Ianniello, one of the initial targets of the investigation, participated. In addition, defendant Carl Moskowitz challenges the interception of his conversations.

## A. The Monday Night Gatherings

On Monday evenings there were gatherings at the offices of C & I Trading, conducted in the conference room, at which card games took place and, according to the government, the illegal enterprises in which defendants were involved were discussed. Because of the large number of people who drifted in and out of the meetings, and because several conversations frequently went on simultaneously, the agents conducting the monitoring encountered substantial difficulty in determining which of the conversations occurring in the meeting were likely to encompass the subjects which the government was investigating. Accordingly, the agent in charge, in consultation with the Assistant United States Attorney supervising the investigation, instructed the monitoring agents that "Monday night meetings should be monitored unless a definite pattern of innocence was established." Judge Tenney was informed by the government of this decision.[51]

The Supreme Court has held that determining the adequacy of minimization measures "requires an evaluation of the reasonableness of the actual interceptions in light of the purpose of the wiretap and the totality of the circumstances before any inquiry is made into the subjective intent of the agents conducting the surveillance." [52] Under both parts of this inquiry, defendants have failed to substantiate their claims. The purpose of the surveillance in this case, and the circumstances under which it was carried on, made the decision to conduct extensive interception of the Monday card games a reasonable one. As the Supreme Court said in the *Scott* case, "when the investigation is focusing on what is though to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." [53] Under

---

**50.** Title III requires that every order authorizing or extending the authorization of electronic surveillance "shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). The orders issued by Judge Tenney conformed to this requirement.

**51.** Affidavit of Brian Taylor, 8/21/85, at 6.

**52.** *Scott v. United States,* 436 U.S. 128, 131, 98 S.Ct. 1717, 1720, 56 L.Ed.2d 168 (1978).

**53.** 436 U.S. at 140, 98 S.Ct. at 1725.

these circumstances, faced with weekly meetings of various possible participants in organized criminal activity, the government reasonably decided to monitor the conversations "unless a definite pattern of innocence was established." Indeed, intercepted conversations strongly confirmed the wisdom of this decision; on one occasion, the monitoring agents' logs reveal, a newcomer came to one of the meetings, saw the card game in progress and asked "Is this how the big guy conducts business?" He was asked in reply "Do you know how many deals are made over cards?" [54]

Nor is there any evidence of bad faith on the part of the authorities conducting the investigation. There were substantial segments of the Monday evening conversations which were not intercepted by the agents pursuant to their minimization instructions.[55] Moreover, the Monday evening interceptions must be placed in the context of the larger program of electronic surveillance carried out in the course of the investigation. During the more than three months that surveillance took place at the offices of C & I Trading, 7108 conversations were intercepted; 5674 of these, or 80% of the total, were intercepted for less than two minutes, which was the period within which the agents were instructed to make a decision as to minimization.[56] These figures alone suggest what the record as a whole makes clear: the agents comprehended and conscientiously attempted to fulfill their responsibility to minimize the intrusion upon communications not subject to the surveillance order. The decision as to how much of the Monday evening conversations to monitor was, in this context, reasonable, and in compliance with the demands of the statute and Judge Ten-

ney's order. The motion on this ground is denied.

### B. Interception of Matthew Ianniello's Conversations

■■■■■■ Defendant Matthew Ianniello also challenges the minimization measures taken by the investigating agents with respect to conversations in which he participated. He requests that the Court hold a hearing to determine if the government complied with the requirements of minimization. Such a hearing will be held only where the government fails to make a prima facie showing of compliance with the statute,[57] or where defendant overcomes the prima facie showing by demonstration of the unreasonable interception of a substantial number of non-pertinent communications.[58] As has been noted above, the Court holds that the government made the requisite showing in this case that its agents were aware of, and made a good faith effort to comply with, the minimization requirements imposed by the statute and Judge Tenney's order. Ianniello fails to meet the burden of showing that, despite this effort at compliance, substantial unreasonable interception of non-pertinent material occurred. The government's analysis of its surveillance logs indicates that of the 148 conversations of Matthew Ianniello which were intercepted in whole or in part, 99, or two-thirds of the total, were either of less than two minutes' duration or were minimized by the monitoring agents.[59] Ianniello contends that despite this statistical showing, a great deal of non-pertinent material was intercepted. He identifies in the surveillance logs references to conversation about cards, losing weight, tax shel-

---

54. Affidavit of Brian Taylor, 8/21/85, at 8.

55. *Id.* at 8–10. The conduct of the investigating agents in this case may usefully be compared to that upheld by the Supreme Court in *Scott,* where the agents intercepted the full content of "virtually all" phone calls made by nine individuals using a single telephone for a one-month period without any attempt at minimization. 436 U.S. at 132, 98 S.Ct. at 1720.

56. Affidavit of Brian Taylor, 8/21/85, Ex. B, at 1.

57. *See United States v. Rizzo,* 491 F.2d 215, 217 n. 7 (2d Cir.), *cert.denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

58. *See United States v. Cirillo,* 499 F.2d 872, 880–81 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974); *United States v. Ramirez,* 602 F.Supp. 783, 791 (S.D.N.Y.1985); *United States v. Baker,* 443 F.Supp. 526, 531 (S.D.N.Y.1977).

59. Affidavit of Brian Taylor, 8/21/85, Ex. B, at 2.

ters, and other assertedly irrelevant subjects. The interception of this material, he argues, demonstrates that the government failed its minimization responsibilities.

 The government's responsibility under these circumstances, however, is not to prevent all interception of non-pertinent material. It is to minimize such interception, in accordance with the fundamental Fourth Amendment standard of reasonableness. In monitoring Matthew Ianniello's conversations, the government contends, it confronted two obstacles: Ianniello's habits of speech frequently made him all but unintelligible to the monitoring agents, while his pattern of conversation rapidly shifted from subject to subject, freely intermixing matter of concern to law enforcement officers with matters not subject to interception under Title III. Thus, conversations in which defendant identifies in the agents' logs references to tax shelters, cards, or other "general conversation," also contained references, according to the same logs, to repayment of allegedly extortionate loans, and to prostitution activities in New York.[60] It is common, of course, for conversations to treat more than one subject, and entirely possible for such dialogues to be comprised of discussion of innocent matters, interspersed with topics of a criminal nature. The statutory requirement of minimization does not mean that only communications exclusively devoted to criminal subjects may be intercepted.

The government has brought forward, upon this record, the necessary showing of its reasonable, good-faith attempt to avoid interception of non-pertinent communications. Ianniello has failed to make a sufficient contradictory showing to necessitate a hearing. Accordingly, the motion is denied.

### C. Interception of Carl Moskowitz' Conversations

Defendant Carl Moskowitz raises additional challenges to the electronic surveillance of the offices of C & I Trading, within whose suite his law offices were located. Moskowitz moves to suppress all intercepted conversations in which he took part on two grounds: first, because of the government's failure to name him as a target of the investigation in its applications for extension of the surveillance period, and second, because he alleges that the government "flagrantly" intercepted conversations subject to the attorney-client privilege.

 Moskowitz' first claim, that suppression is required for failure to name him as a target of the investigation, is contrary to the decision of the Supreme Court in *United States v. Donovan,* [61] which held that failure to name an individual as a target of electronic surveillance does not mandate suppression of the individual's conversations intercepted pursuant to a surveillance order complying with the formal and procedural requirements of Title III. Reaffirming the rule that suppression is necessary only where there is a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device," [62] the Court held that the statutory provision calling for the naming of all targets of the investigation did not directly and substantially implement the congressional purpose to limit electronic surveillance.[63]

In an attempt to distinguish the present case from the rule announced in *Donovan,* Moskowitz argues that *Donovan* concerned an inadvertent failure to name all targets

---

**60.** Affidavit of Brian Taylor, 8/21/85, at 10–11.

**61.** 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

**62.** *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

**63.** *Donovan,* 429 U.S. at 435–37, 97 S.Ct. at 671–73.

of the investigation, and that this case concerns the government's deliberate omission of Moskowitz' name from the extension applications. What the Supreme Court said in *Donovan,* however, was:

> There is no suggestion in this case that the Government agents knowingly failed to identify [the other defendants] for the purpose of keeping relevant information from the District Court *that might have prompted the court to conclude that probable cause was lacking.* If such a showing had been made, we would have a different case.[64]

Thus, even if Moskowitz could show that the government had knowingly failed to name him as a target of the investigation, and no such showing has been made, it would still be necessary for him to show that naming him as a target might have changed the outcome of Judge Tenney's probable cause determination. Nothing has been brought forward to support this proposition. Indeed, the only statement made about the government's alleged deliberate failure to name Moskowitz is that "naming an attorney as the target of electronic surveillance would have raised serious questions about the government's application. For example, Judge Tenney would surely have wanted to know why the government had not previously informed him that Carl Moskowitz operated his law practice out of C & I Trading."[65] This conjecture, that the government hid Carl Moskowitz or his law practice from the judge supervising the surveillance, is incorrect. In the government's Seven Day Report to Judge Tenney dated September 24, 1982, three days before the first application for extension of surveillance, Carl Moskow-

itz is mentioned as participating in a conversation and is identified as "an attorney at C & I Trading."[66] Judge Tenney was informed of Carl Moskowitz' law practice at the premises of C & I Trading before any extension applications were reviewed; Moskowitz' assertion that the government could not name him as a target of the surveillance without undermining its probable cause showing is unsupported by any evidence, and, as a result, suppression of conversations is unwarranted.[67]

▇ Moskowitz also argues that all intercepted conversations in which he was a participant should be suppressed because the government engaged in "flagrant" interception of communications subject to the attorney-client privilege. Neither the facts nor the law supports this claim.

The agents conducting the electronic surveillance of the offices of C & I Trading were given extensive instructions concerning minimization of interception of conversations covered by the attorney-client privilege. These instructions began with the simple statement: "We may not intercept *any* conversation or conduct which would fall under any legal privilege."[68] The agents were instructed to shut off all surveillance equipment upon detection of privileged conversation, and to use intermittent "spot monitoring" to determine when privileged conversation had ceased; the instructions required all doubts to be resolved in favor of privilege, and thus against interception. Moskowitz brings forward no evidence to suggest that these minimization rules were not observed. Indeed, although he identifies nine conversations allegedly covered by the privilege which were inter-

---

**64.** 429 U.S. at 436 n. 23, 97 S.Ct. at 672 n. 23 (emphasis added).

**65.** Defendants' Joint Pre-Trial Memorandum of Law, at 48.

**66.** Seven Day Report, September 24, 1985, at 6.

**67.** Moskowitz also claims to draw support from the decision of this Court in *United States v. Shipp,* 578 F.Supp. 980, 990 (S.D.N.Y.1984),, *aff'd,* 754 F.2d 1427 (2d Cir.1985). *See* Defendants' Joint Pre-Trial Memorandum of Law, at 49–50. The *Shipp* decision, despite Moskowitz' selective quotation, does not support the argu-

ment he advances. The Court made clear in *Shipp,* in rejecting the argument that failure to name required suppression, that the evidence as to probable cause showed that the government's failure to name two of the defendants as targets of the surveillance, whether deliberate or inadvertent, could have had no effect on the decisions to order and extend the surveillance. *Shipp,* 578 F.Supp. at 991.

**68.** Affidavit of Brian Taylor, 8/21/85, Ex. A (Instructions for Electronic Interception), at 10.

cepted by the government,[69] summaries of the surveillance logs for the dates in question reveal that 38 of Moskowitz' 41 conversations intercepted on those dates, a total of 93 per cent, were minimized by the agents.[70]

Nor has Moskowitz cited any authority in support of the proposition that the alleged interception of some privileged material requires that all conversations, privileged and unprivileged, be suppressed. If upon the trial the government seeks to introduce evidence as to which an objection of privilege is raised, the matter will then be determined. The present question is not whether conversations subject to the privilege should be excluded, but rather whether all conversations should be suppressed upon an allegation that some of them are privileged, and that the government's interception of privileged conversations was "flagrant." Finding, as the Court does, that there was no abuse whatever, but that the government agents were correctly and appropriately instructed as to their responsibility with respect to privileged communications, the motion is denied.

### III. Challenges to the Legal Sufficiency of the Indictment

#### A. Mail Fraud Involving the State Liquor Authority

Defendants move to dismiss counts 3 to 19 of the indictment, charging 23 acts of racketeering. Each of these counts concerns the use of the mails in connection with applications to state liquor authorities for the issuance of liquor licenses to bars and restaurants. The government claims that the applications were false and part of a scheme to defraud inasmuch as they failed to disclose that defendants Matthew Ianniello and Benjamin Cohen had financial and proprietary interests in the bars and restaurants involved, which information would have led, at a minimum, to further inquiry. Other counts in the indictment charge that, as part of a scheme to defraud, defendants used the mails to file false statements of income for state sales tax, and removed from the various businesses involved the difference between the receipts as reported and the actual receipts of the businesses.

The ground upon which defendants move to dismiss the counts relating to application to the New York State Liquor Authority ("SLA") is that the Twenty-First Amendment to the Constitution gives the States sole jurisdiction over the domestic production, transport and sale of alcoholic beverages. The federal government may not, according to defendants, use a facially general federal criminal statute, such as the mail fraud statute, to punish violation of the state liquor laws.

Whether this proposition is true or false, it is irrelevant to this case. Here the federal government seeks to punish not the violation of state liquor laws, but the use of the mails in furtherance of a scheme to defraud, in which false statements to the SLA played a substantial part. A close review of the indictment, considered against the scope of the mail fraud statute, requires that defendants' motion to dismiss be denied.

The purpose of the federal mail fraud statute[71] is to prevent the exploitation of the facility provided by the Post Office for fraudulent purposes.[72] A scheme to defraud may be punished under the federal mail or wire fraud statute whether or not it also violates state law.[73] The mailing need not be contemplated as an essential element of the scheme; it is enough that "the use of the mails will follow in the ordinary course of business,

---

69. Defendants' Joint Memorandum of Law, at 38–39.

70. Affidavit of Brian Taylor, 8/21/85, at 14.

71. 18 U.S.C. § 1341.

72. Parr v. United States, 363 U.S. 370, 389, 80 S.Ct. 1171, 1182, 4 L.Ed.2d 1277 (1960); United States v. Margiotta, 688 F.2d 108, 121 (2d Cir.

1982), cert.denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

73. Parr, 363 U.S. at 389, 80 S.Ct. at 1182; United States v. DeFiore, 720 F.2d 757 (2d Cir.1983) (wire fraud statute applicable to scheme to defraud state taxation authorities), cert.denied, Coppola v. United States, 466 U.S. 906, 104 S.Ct. 1684, 82 L.Ed.2d 820 (1984).

or [that] such use can reasonably be foreseen, even though not actually intended." [74]

The indictment charges, among other matters, that Matthew Ianniello and Benjamin Cohen, along with other defendants, enriched themselves through the fraudulent removal of money from various bar and restaurant businesses in New York. The cash "skimmed" from these businesses was allegedly concealed and diverted both from state and federal taxation authorities and from the creditors of one of the establishments through bankruptcy fraud. It is clear that some of the revenues of the establishments involved in the case were generated through the sale of liquor, and that such sales could only take place if the establishments were licensed to sell alcoholic beverages by the state. The concealment of Ianniello's and Cohen's interest in the establishments allegedly facilitated the process by which the licenses were issued to others and Ianniello and Cohen were thereby enabled to remove cash from the businesses while avoiding detection. Plainly the government attempts to punish not false statements to the SLA, but rather the use of the mails in furtherance of the larger scheme.

▆ It is for this reason that defendants' Twenty-First Amendment argument is irrelevant. The Amendment does not forbid federal prosecution of a criminal scheme incidentally involving the trade in alcoholic beverages.[75] The indictment here charges that defendants' conduct was a federal felony because it furthered a criminal scheme to defraud in connection with which the use of the mails was reasonably forseeable. It is of merely incidental relevance to the scheme that the mailings involved consisted of communication between defendants and the SLA.[76] The alleged false statements to the SLA, and the mailings resulting from them in the ordinary course of business, were "incident to an essential part of the scheme" charged,[77] which was to skim money from restaurants and bars. Under these circumstances, the Twenty-First Amendment raises no obstacle to the federal prosecution.

▆ Defendants also argue that the acts described in counts 3 to 19 constitute a scheme to *deceive*, rather than a scheme to *defraud* punishable under the mail fraud statute. In particular, they contend, the false statements to the SLA did not defraud the SLA of any property or protected interest. This argument too is based upon a selective and unrealistic reading of the indictment. The goal of the scheme charged by the government was not the acquisition of liquor licenses; it was the alleged diversion of the profits of the licensed enterprises and evasion of taxes due both state and federal governments. Such diversion and evasion is, of course, a direct pecuniary benefit to the schemer.[78]

---

**74.** *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954).

**75.** The Twenty-First Amendment does not bar, for example, a criminal antitrust prosecution under the Sherman Act of horizontal price-fixing by state-licensed liquor distributors where the state regulatory scheme does not prohibit such horizontal conspiracies. *See United States v. Frankfort Distilleries,* 324 U.S. 293, 299, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945).

**76.** For this reason, defendants' contention that the SLA could not have denied the issuance of liquor licenses on the basis of the information concealed in the applications is beside the point. Mail fraud cannot be predicated upon a scheme to defraud which is itself not in violation of the law. *See United States v. Pisani,* 773 F.2d 397, 407 (2d Cir.1985). Here, however, the scheme was not to obtain liquor licenses, but to engage in further transactions defrauding taxing authorities and other legitimate creditors of the business establishments. The concealment of Ianniello's and Cohen's interests in the proposed licensed premises foreclosed further inquiry which might have revealed the frauds. Whether the statements to the SLA were in themselves illegal or not makes no difference whatever.

**77.** *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954).

**78.** It is this element which distinguishes the present case from *United States v. Regent Office Supply Co.,* 421 F.2d 1174 (2d Cir.1970), and *United States v. Dixon,* 536 F.2d 1388 (2d Cir. 1976), which are relied upon by defendants. In *Regent,* false statements were made by sales personnel as to their identities and the source of the products sold, but goods of appropriate value were delivered in return for the price paid by customers, which was in all cases less than the price previously paid for the same goods. In *Dixon,* a corporate president failed to inform stockholders in a proxy solicitation of loan

Defendants contended at oral argument that the mailings between the SLA and defendants were "too remote" from the subsequent alleged skimming for a mail fraud charge to lie. Even if the only purpose of concealing the identities of those with economic interests in the restaurants and bars were to decrease the risk of detection in the larger fraud, such a purpose would be sufficient to bring the SLA mailings within the mail fraud statute.[79] Here the mailings charged enabled those involved to conceal the identities of those who skimmed the profits; they were clearly an integral part of the scheme alleged by the indictment. Defendants' motion to dismiss the mail fraud counts must be denied.[80]

## B. Relation-Back of RICO Forfeiture

■ Defendants challenge the relation-back element of RICO's amended forfeiture provision[81] on the ground that, as applied to them, it violates the Constitutional prohibition of ex post facto laws.[82] The indictment charges numerous racketeering acts, the most recent of which occurred in February of 1984;[83] the relation-back provision of RICO did not go into effect until October 12, 1984. Defendants claim that the government's decision to seek a verdict declaring that specified assets are "subject to forfeiture as of the date they were acquired, maintained, and utilized"[84] is an ex post facto application of the statute.

The decisions of the Supreme Court interpreting the ex post facto clauses of the Constitution "have not attempted to precisely delimit the scope of the Latin phrase, but have instead given it substance by an accretion of case law."[85] Under the principles enunciated by the case law "two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."[86] Thus, to succeed under

---

transactions between himself and the corporation, as required by SEC regulations. Both *Dixon* and *Regent* involved mailings used for the direct acquisition, through false representations, of intangible benefits. This indictment, on the contrary, charges a scheme in which the mails were used indirectly to facilitate the fraudulent acquisition of money.

79. *See United States v. Elkin,* 731 F.2d 1005, 1008–09 (2d Cir.), *cert.denied,* — U.S. —, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). In *Elkin,* a "Verification Letter" sent two years after the fact, in purported substantiation of false claims made pursuant to a government contract, was held to be a valid predicate for a mail fraud charge. The Court of Appeals found that the letter was mailed "in order to conceal the falsity of the [earlier] Request and to increase the chances that defendants would retain the fruits of their fraud." 731 F.2d at 1009. The mailing therefore played "an integral role in the scheme." *Id.*

80. Defendants contend, with respect to counts 7 to 10 of the indictment, that mail fraud cannot be charged on this theory because there is no allegation of skimming of cash from the businesses involved in those counts. Defendants' Joint Reply Memorandum, at 38. This argument must fail because, as our Court of Appeals has pointed out more than once, the statute does not require that the underlying fraudulent scheme be successfully completed. *See United States v. Dixon,* 536 F.2d 1388, 1399 n. 11 (2d Cir.1976); *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180–81 (2d Cir.1970).

81. The new provision at issue, 18 U.S.C. § 1963(c), provides in full:

All right, title and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeit to the United States, unless the transferee establishes in a hearing pursuant to subsection (m) [of 18 U.S.C. § 1963] that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

This provision was added to RICO by the Comprehensive Forfeiture Act of 1984, 98 Stat. 2192 (1984), which became effective on October 12, 1984.

82. U.S. Const. Art. I, § 9.

83. Indictment, paras. 11, 44.

84. Indictment, para. 40.

85. *Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977).

86. *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981); *see also Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("it is axiomatic that for a

this test, defendants must show that the relation-back doctrine did not apply in RICO forfeiture before the 1984 amendments, and that their prior rights have been impaired as a result of the application of the relation-back doctrine. Defendants rely upon the holding of the Court of Appeals for the Seventh Circuit in *United States v. McManigal*[87] for the proposition that RICO, before its amendment by the Comprehensive Forfeiture Act of 1984, did not provide for verdicts of forfeiture to relate back to the date of the property's acquisition.[88] Our Court of Appeals has not addressed the issue presented in *McManigal*, and subsequent to the argument of this motion the Seventh Circuit overruled its prior decision,[89] but even if the original holding were accepted by this Court, defendants' motion still could not succeed. *McManigal* only supported the proposition that relation-back is a new doctrine under the 1984 amendments; although defendants urge that "it is also clear that the second prong of the *Weaver* test is met here because use of the relation-back doctrine would be an increased punishment,"[90] they have failed to demonstrate that relation-back in any sense increases their punishment.

The major Congressional purpose behind the enactment of § 1963(c), as defendants' own citation to the legislative history reveals, was to "close a potential loophole" in the RICO forfeiture provision:

> The problem of pre-conviction dispositions of property subject to criminal forfeiture is further complicated by the question of whether, simply by transferring an asset to a third party, a defendant may shield it from forfeiture. In civil forfeitures, such transfers are voidable, for the property is considered "tainted" from the time of its prohibited use or acquisition.[91]

Accordingly, § 1963(c) is aimed at transactions in which property subject to forfeiture has been conveyed to third parties before conviction.[92] The first sentence of § 1963(c), which provides that "all right, title and interest" in forfeitable property "vests in the United States upon the commission of the act giving rise to forfeiture," is in aid of the remainder of § 1963(c); it provides the government with a secure legal basis on which to pursue transferred assets subject to forfeiture. The remedy which it implies, and which is specified elsewhere in the section, is against third parties, not against the convicted defendant.

For this reason, if a defendant should be convicted and the jury should enter a special verdict of forfeiture, that forfeited property which is still in the defendant's possession will be subject to forfeiture in precisely the same fashion as if § 1963(c)

---

law to be *ex post facto* it must be more onerous than the prior law.")

**87.** 708 F.2d 276 (7th Cir.), *vacated,* 464 U.S. 979, 104 S.Ct. 419, 78 L.Ed.2d 355, *re-aff'd on remand,* 723 F.2d 580 (7th Cir.1983).

**88.** *McManigal* was vacated by the Supreme Court and remanded for reconsideration in light of the Court's decision in *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). In *Russello,* the Court held that the "interests" subject to forfeiture under RICO prior to the 1984 amendments included any "profits or proceeds" from an enterprise carried on in violation of the statute, and not merely, as the Seventh Circuit and other Courts of Appeals had held, the defendant's legal interest in the enterprise itself. At the same time, the Court declined to resolve "any ambiguity that might be inherent in the terms 'profits' and 'proceeds.' [The] use of those terms is not intended to

suggest a particular means of calculating the precise amount that is subject to RICO forfeiture in any given case." 464 U.S. at 29 n. 3, 104 S.Ct. at 304 n. 3. On this ground, that the Court had left open the particular means of calculating the amount subject to RICO forfeiture, the Seventh Circuit on remand reaffirmed its previous holding that the relation-back doctrine did not apply to RICO forfeiture before the 1984 amendments. 723 F.2d at 580.

**89.** *United States v. Ginsburg,* 773 F.2d 798 (7th Cir., 1985) (en banc).

**90.** Defendants' Joint Pre-Trial Memorandum of Law, at 121.

**91.** S.Rep. No. 98–225, 98th Cong., 1st Sess. 196 (1983), U.S.Code Cong. & Admin.News, 1983 pp. 3182, 3379.

**92.** *Id.* at 200–01.

had never been enacted. Any such property in the hands of third parties will also be subject to forfeiture, but that is not a punishment of the defendant and he is not the one disadvantaged by the statute's operation. The third party may, of course, defeat the government's claim upon a showing that he is a "bona fide pruchaser for value ... and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." [93] Defendants have therefore failed to establish that the operation of the RICO forfeiture provisions as against them provides for new sanctions not available under the statute at the time of the alleged offenses, and accordingly their claim that the provision is a prohibited ex post facto law must be denied.

## IV. Procedural Motions

### A. Severance

Defendants move to sever the trial of this indictment into several smaller trials based upon each defendant's alleged association with specific businesses. In particular, individual defendants who are charged in connection with the affairs of only a single bar or restaurant [94] contend that they will be prejudiced by the extended testimony as to the business affairs of other establishments with which they were not connected. These defendants contend that an indictment containing sixty-seven counts charged against fourteen defendants is, by virtue of its size alone, likely to give rise to "spillover" prejudice, because it becomes more and more difficult for a jury, no matter how conscientious, to segregate the evidence applicable to each defendant's individual case.

Any analysis of such requests for severance must begin from the position, repeatedly expressed in the decisions of our Court of Appeals, that defendants who are indicted together will normally be tried together.[95] This presumption cannot be defeated merely by the number of defendants involved, or the number of counts upon which they must face trial. "There can be no litmus paper test depending upon the number of defendants and the expected length of the trial. Rather, the inquiry must be whether the defendants [will be] afforded a fair trial." [96] As this Court has previously said:

> The ultimate question is whether, under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.[97]

In this case, the indictment charges that the defendants were associated in a criminal enterprise, which operated through a pattern of illegal activity. Each of the defendants seeking a severance is charged by the government with participating in this common scheme in support of the enterprise. That some of the defendants are charged with playing minor roles does not entitle them to be tried separately; indeed, if they are found to be intentional members of a charged conspiracy, the acts and con-

---

**93.** 18 U.S.C. § 1963(m)(6)(B).

**94.** Defendant Chester Cohen, for example, is charged with criminal activity only in connection with the affairs of Erco Restaurant, Inc., while Robert, Oscar and Alfred Ianniello are charged only with respect to the activities of Osbro Restaurant, Inc.

**95.** *See United States v. Ventura,* 724 F.2d 305 (2d Cir.1983); *United States v. Lyles,* 593 F.2d 182 (2d Cir.), *cert.denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); *United States v. Borelli,*

435 F.2d 500 (2d Cir.1970), *cert.denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971).

**96.** *United States v. Moten,* 564 F.2d 620, 627 (2d Cir.), *cert.denied,* 434 U.S. 942, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977); *see United States v. Potamitis,* 739 F.2d 784, 790 (2d Cir.), *cert.denied,* —— U.S. ——, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

**97.** *United States v. Kahaner,* 203 F.Supp. 78, 81–82 (S.D.N.Y.1962), *aff'd,* 317 F.2d 459 (2d Cir.), *cert.denied,* 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

duct of the other members of the enterprise in furtherance of its objectives would be evidence against them, though they were not present, and need not necessarily have known of the acts and conduct of their co-conspirators.[98]

■ Upon close review of the record as it now stands, the Court is satisfied that it is within the capacity of conscientious jurors to segregate the evidence applicable to each defendant so as to render a fair and impartial verdict. Accordingly, the motion for severance is denied.

### B. Request for a James Hearing

■ Defendants request that the Court conduct a pre-trial hearing to determine the basis for admission in evidence of hearsay statements intended by the government to be offered at trial under the exception contained in Fed.R.Evid. 801(d)(2)(E), which admits as against one another the declarations of co-conspirators in furtherance of the conspiracy.[99] Our Court of Appeals has consistently held, however, that such evidence is admissible subject to the trial court's determination, made at the end of the government's case, that the non-hearsay evidence is sufficient, as to each conspirator against whom such statements are sought to be introduced, to show that he or she participated in the conspiracy.[100] Defendants would require this Court to undertake a mini-trial, significantly prolonging the proceedings in the case and affording the defendants a complete preview of the government's evidence. The conditional receipt of hearsay evidence is a far better solution; this Court's experience leaves it in no doubt that juries clearly comprehend and conscientiously follow instructions to disregard evidence which has been stricken. Accordingly, the motion is denied.

### C. Bill of Particulars

Defendants have requested that the government supplement its detailed 85-page indictment with a bill of particulars concerning several of the offenses charged. The government has agreed to provide further particulars dealing with the federal tax evasion counts in the indictment, but opposes any further particulars not already granted by consent.

■ The indictment provides a substantial catalogue of the names, dates and places connected with the government's allegations of wrongdoing, and satisfies the demands of *Wong Tai v. United States.*[101] Defendants have in general been provided with the information necessary to "properly ... prepare for trial, ... meet the Government's case and ... avoid surprise upon the trial." [102] To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars.[103]

■ One of defendants' requests, however, should be granted. Paragraph 40 of the indictment contains the government's allegations concerning the forfeiture it will seek pursuant to 18 U.S.C. § 1963(a). As to four of the defendants, Morton Walker, Carl Moskowitz, Bradford Cohen and Sol

---

**98.** See Fed.R.Evid. 801(d)(2)(E); *United States v. Aboumoussallem,* 726 F.2d 906, 910 (2d Cir. 1984).

**99.** Such a hearing is required in the Fifth Circuit. *See United States v. James,* 576 F.2d 1121 (5th Cir.1978), *modified en banc* 590 F.2d 575 (5th Cir), *cert.denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

**100.** *United States v. Geaney,* 417 F.2d 1116 (2d Cir.1969), *cert.denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). *See United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert.denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Mastropieri,* 685 F.2d 776 (2d Cir.), *cert.denied,* 459 U.S. 945, 103

S.Ct. 260, 74 L.Ed.2d 203 (1982); *United States v. Cambindo-Valencia,* 609 F.2d 630 (2d Cir. 1979), *cert.denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980); *United States v. Wilson,* 565 F.Supp. 1416, 1437 (S.D.N.Y.1983).

**101.** 273 U.S. 77, 80–81, 47 S.Ct. 300, 301–02, 71 L.Ed. 545 (1927). *See also United States v. Wilson,* 565 F.Supp. 1416, 1438–39 (S.D.N.Y.1983); *United States v. Cafaro,* 480 F.Supp. 511, 518 (S.D.N.Y.1979).

**102.** *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962).

**103.** *See United States v. Wilson,* 556 F.Supp. 1416, 1439 (S.D.N.Y.1983).

Goldman, the indictment seeks forfeiture of "[a]ny interest obtained in violation of Title 18, United States Code, Section 1963." Fed.R.Crim.P. 7(c)(2) states that "[n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or information shall allege the extent of the interest or property subject to forfeiture." Our Court of Appeals has upheld an indictment which specified that all defendant's interests in a criminal enterprise would be seized when the accompanying bill of particulars listed fourteen pieces of property deemed by the government to be subject to forfeiture.[104] The specification of items of property in the bill of particulars "enabled [the defendant] to marshal evidence in defense of them."[105] This requirement, imposed upon the government by the Rule 7(c)(2), is not met when the indictment goes no further than the statement that all property acquired in violation of law may be subject to forfeiture.

In light of the holding by our Court of Appeals in *Grammatikos* that a bill of particulars may supplement the indictment for purposes of Fed.R.Crim.P. 7(c)(2), the government will be required to state the extent of the interest or property held by Morton Walker, Carl Moskowitz, Bradford Cohen and Sol Goldman alleged by the government to be subject to forfeiture. All other requests for particulars not already consented to by the government will be denied.

### D. Striking Aliases from the Indictment

Defendants move, pursuant to Fed.R. Crim.P. 7(d), to strike from the indictment the aliases of Matthew Ianniello and Benjamin Cohen,[106] and to remove from the indictment all references to "racketeering" or "co-racketeers."

Motions to strike surplusage from an indictment "will be granted only where it is clear that the allegation complained of is not relevant to the charge contained in the indictment and is inflammatory and prejudicial."[107] If the evidence of the allegation is admissible and relevant to the charge, then it will not be stricken, regardless of its prejudicial effect.[108] With respect to the aliases of Matthew Ianniello and Benjamin Cohen, the government states that it will prove at trial that the defendants used and were known by those names, and are so referred to on tape recordings that will be introduced in evidence. "Under the circumstances, inclusion of the aliases in the indictment is proper, and, indeed, may well serve to obviate jury confusion."[109]

With respect to the words "racketeering" and "co-racketeers," the motion to strike must also be denied. These words are terms of art, whose meanings are established by the statute under which the government proceeds.[110] To strike them from the indictment would be equivalent to striking the words "conspiracy" and "co-conspirators" from an indictment charging that offense. These words are not "surplusage" under any conceivable definition of that term. The motion to strike is denied.

So ordered.

104. *United States v. Grammatikos,* 633 F.2d 1013, 1024 (2d Cir.1980).

105. *Id.*

106. The indictment states that Matthew Ianniello is also known as "Matty the Horse," and that Benjamin Cohen is also known as "Benny Cohen." The government has consented to strike the words "the Horse" from the indictment, and accordingly those words shall be deleted.

107. *United States v. Klein,* 124 F.Supp. 476, 480 (S.D.N.Y.1954), *aff'd,* 247 F.2d 908 (2d Cir.1957),

cert.denied, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958); *see United States v. Napolitano,* 552 F.Supp. 465 (S.D.N.Y.1982).

108. *United States v. Chas. Pfizer & Co.,* 217 F.Supp. 199, 201 (S.D.N.Y.1963).

109. *United States v. Esposito,* 423 F.Supp. 908, 911 (S.D.N.Y.1976); *see United States v. Miller,* 381 F.2d 529, 536 (2d Cir.1967), *cert.denied,* 392 U.S. 929, 88 S.Ct. 66, 20 L.Ed.2d 1387 (1968).

110. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity").